IAMA CORPORATION, WILLIAM C. DIERCKS AND VIRGINIA DIERCKS, Appellants, v. HARRY P. WHAM, Respondent.

No. 13629

October 3, 1983                              669 P.2d 1076

---

[1]The parties apparently agree that the election workers are "casual." *See* NRS 616.030.

[Rehearing denied December 8, 1983]

*Sacco, Toigo & Burns,* Las Vegas, for Appellants.

*J. E. Ring Smith,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

This is an appeal from a judgment awarding respondent Harry P. Wham (Wham) possession of certain secured collateral, $17,768.17 for damages sustained in the maintenance of the collateral during the pendency of litigation, and $15,000 in attorney's fees. We conclude that a major portion of the damages allegedly sustained by Wham in the maintenance of the collateral arose out of the maintenance of a leasehold improperly listed in the security agreement and improperly transferred to Wham's possession by the court below. Further, we find the sale by which Wham took possession of the collateral was not conducted in a commercially reasonable manner. We therefore set aside the sale of the collateral, and remand this case with appropriate instructions.

### FACTS

In 1972, appellants IAMA Corporation, William C. Diercks and Virginia Diercks (hereinafter Diercks) purchased the master lease on premises located on Vegas Valley Drive in Las Vegas for the purpose of operating a restaurant. Several years later, in August, 1975, Diercks borrowed $11,500 from Anthony Mazzuca (Mazzuca) and signed a promissory note for $17,000. By its terms, this note was to be paid within two to four weeks, and provided for the accrual of interest at ten percent per annum. The note was ostensibly secured by Diercks' "leasehold interest" in the Vegas Valley Drive property, and all the "personalty, furniture and fixtures" located on the premises. Mazzuca subsequently filed the note and a completed Uniform Commercial Code Article Nine financing statement (*see* 104.9402) with the county recorder; the financing statement listed as collateral "[a]ll furniture, fixtures, equipment, appliances and stock-in-trade located at" the Vegas Valley Drive premises.

Diercks did not repay Mazzuca within the agreed time. Instead, Diercks allegedly entered into an oral agreement with Mazzuca, whereby Mazzuca agreed to pay Diercks $25,000 as a "finder's fee" if Diercks found a purchaser for commercial property owned by Mazzuca. Pursuant to this alleged agreement, Diercks apparently conducted a search for a buyer and approximately one year later allegedly located a buyer for Mazzuca's property. Diercks did not receive any direct compensation for his efforts; instead, it is Diercks's contention that Mazzuca agreed to apply the $25,000 "finder's fee" against the outstanding note.

In 1978, Diercks entered into negotiations with respondent Wham for the sale of the Vegas Valley Drive property listed as collateral in the 1975 Mazzuca note. Wham offered to purchase the restaurant for $80,000, and steps were taken to execute a contract of sale. Shortly before the contract was to be executed, however, Wham apparently learned of the outstanding 1975 note. Rather than purchase the restaurant, Wham purchased the outstanding note from Mazzuca for $20,000 and demanded immediate possession of the leasehold collateral.

Diercks refused to surrender the property, claiming that the Mazzuca note was usurious and that the underlying obligation had been satisfied by the "finder's fee" agreement with Mazzuca. At the time Wham purchased the note he was aware that Diercks was claiming these defenses; nonetheless, Wham continued to demand immediate possession of the property. When Diercks continued to refuse to surrender the collateral, Wham brought an action in district court to obtain possession of the property.

After a pretrial hearing, the district court ordered Diercks to surrender the collateral, including the leasehold interest in the Vegas Valley Drive restaurant. After taking possession, Wham leased the premises immediately adjacent to the restaurant and made major alterations in the building, seating and lighting arrangements in order to operate the two premises as one establishment. Wham also obtained a liquor license to operate a bar at the combined location, and ultimately conducted a sale to dispose of the collateral. At this sale Wham purchased the property for $20,050; this transaction was completed before the district court entered final judgment in the instant action.

After procedural delays which are not relevant to this appeal, the district court ordered bifurcation of the trial on Wham's action to gain possession of the collateral. In the first phase of the trial, the court addressed the issue of whether the Mazzuca note was usurious. At the conclusion of the presentation of evidence on this issue, the court held that the note was usurious, that all the interest was therefore void, and that the value of the note was $11,500.

The second phase of the trial addressed only whether the sale of the property was commercially reasonable, and whether Wham could be a holder in due course of the note if he took the note with notice of Diercks' claimed defenses of usury and set-off. The court found that Wham was entitled to holder in due course status despite his knowledge of the possible defenses, and that the sale of the property was commercially reasonable. The court entered judgment for Wham, and included in its award of damages expenses incurred by Wham while maintaining the collateral over the course of the litigation.

## FINDER'S EXCEPTION

At the hearing which resulted in the district court granting Wham possession of the collateral, Diercks argued that Wham was not entitled to holder in due course status because he took the Mazzuca note with notice of the asserted defenses of usury and setoff. After hearing evidence on this issue, the court below ruled that the agreement is not enforceable as Diercks was not a licensed real estate broker or salesman, and further ruled that the evidence was insufficient to establish the Defendant's claim of setoff. On appeal, Diercks maintains that the district court erred in failing to recognize his alleged agreement with Mazzuca as a defense to the note, and urges this court to adopt a "finder's exception" to the real estate licensing statutes which would provide Diercks with a defense to the note. See Tryone v. Kelley, 507 P.2d 65 (Cal. 1973).

We have examined the record, however, and conclude that Diercks has not carried his burden of demonstrating that the court below erred in failing to recognize the existence of the alleged agreement. *See* Plankinton v. Nye County, 95 Nev. 12, 588 P.2d 1025 (1979).

Diercks did not request the district court enter findings which would establish that the court found the purported agreement with Mazzuca in fact existed, but was unenforceable as a matter of law due to the real estate statutes. *See* Beggs v. Lowe, 89 Nev. 547, 516 P.2d 467 (1973); Islandia, Inc. v. Marechek, 82 Nev. 424, 420 P.2d 5 (1966). This court has previously held that in the absence of express findings, it will imply findings where the evidence clearly supports the judgment. *See* Cooper v. Pacific Augo. Ins. Co., 95 Nev. 801, 603 P.2d 281 (1979); Gorden v. Gorden, 93 Nev. 494, 496, 569 P.2d 397 (1977); Richfield Oil Corp. v. Harbor Ins. Co., 85 Nev. 185, 192, 452 P.2d 462 (1969). In the instant case, due to counsel's failure to request express findings, this court is bound to presume that the district court found that the agreement between Mazzuca and Diercks, the existence of which was denied by Mazzuca, was not sufficiently established.

Thus, even if this court were prepared to recognize a "finder's exception" to the real estate licensing statutes, we must presume that the district court found there was no agreement which would allow Diercks to assert such a defense. We therefore affirm the decision of the court below on this issue.

## SECURITY INTEREST IN A LEASEHOLD

Although we affirm the district court's decision inasmuch as

it applies to the asserted defense based upon the alleged agreement, we find the court below erred when it allowed Wham to take possession of a leasehold by means of the security agreement.

Secured transactions of the type underlying the instant case are governed by Nevada's version of Article Nine of the Uniform Commercial Code, set forth at NRS 104.901-104.9507. NRS 104.9104 enumerates those transactions which are expressly *excluded* from coverage under Nevada's version of Article Nine. Of particular significance in the instant case is the exclusion contained in NRS 104.9104(10), which provides, in pertinent part, that Article Nine does *not* apply "to the creation or transfer of an interest in or lien on real estate, *including a lease* or rents thereunder. . . ." (Emphasis added.) Further, NRS 104.9102(1)(a) provides in pertinent part that Article Nine applies to any transaction "which is intended to create a security interest in personal property or fixtures. . . ." This unequivocal language makes it quite clear that a leasehold is not subject to the provisions of Article Nine even though it might be listed in the security agreement. *See* Hilst v. Bennett, 485 P.2d 880, 882 (Colo. 1971); *see also* Ingram v. Ingram, 521 P.2d 254, 260-261 (Kansas 1974).

In the instant case, the note provided it was secured by the "leasehold interest" in the Vegas Valley Drive property. On the strength of this note, the district court allowed Wham to take possession of the leasehold, to remain in possession despite Diercks's efforts to regain the property, and finally to dispose of the collateral. It is quite clear, however, that the leasehold could not be transferred or disposed of under an Article Nine security agreement.[1] Thus, Wham should not have been permitted to take possession or dispose of the property, and the district court's failure to recognize that the leasehold could not be transferred in this fashion constituted error.

## COMMERCIALLY REASONABLE SALE

We also conclude that the district court erred in finding Wham conducted the sale of the collateral in a commercially reasonable manner.

After default, a secured party may sell, lease or otherwise dispose of any or all collateral. Every aspect of the disposition, however, including the method, manner, time, place, and

---

[1]Wham has not suggested, either in the court below or on appeal, that the note might have created an enforceable interest in the property other than by way of Article Nine. Accordingly, we do not address the issue of whether the note may have created an interest enforceable by some mechanism other than Article Nine.

terms of the disposition must be commercially reasonable. *See* NRS 104.9504(3). Further, this court has noted that a wide discrepancy between the sale price and the value of the collateral compels close scrutiny into the commercial reasonableness of the sale. *See* Levers v. Rio King Land & Inv. Co., 93 Nev. 95, 98-99, 560 P.2d 917 (1977); Jones v. Bank of Nevada, 91 Nev. 368, 535 P.2d 1279 (1975).

In the instant case, it is undisputed that at one point Wham offered to purchase the restaurant for $80,000, which presumably represented his considered judgment of the property's market value. Wham was subsequently able to acquire the property at the sale for $20,050, or slightly more than one-fourth the price he was prepared to pay before purchasing the Mazzuca note. We believe such a discrepancy compels close scrutiny into the commercial reasonableness of the sale.[2]

If the sale is closely scrutinized, it becomes apparent that the sale was not conducted in a commercially reasonable manner. It appears Wham did attempt to conform to the norms governing such sales; the district court found that Wham gave proper notice of the sale, that the sale was conducted by the sheriff's department in accordance with normal procedures, and that bidding at the sale was spirited and competitive.

Unfortunately, Wham's actions while maintaining the collateral before the sale vitiated the procedural safeguards adhered to at the sale itself. As previously noted, after taking possession of the collateral Wham leased the premises immediately adjacent and proceeded to make major alterations in the structure of the building. Wham apparently knocked out walls, changed the floor configuration, altered the lighting, and made other substantial changes in the restaurant in order to operate the two leaseholds as one business. By these actions Wham effectively destroyed the separate identity of the property, "comingling" the collateral with the premises next door. Finally, Wham obtained a liquor license and operated a bar at the combined location. After Wham obtained the license, a county ordinance was enacted which prohibited two liquor licensees from operating within 1500 feet of one another. The inability to obtain a liquor license for the restaurant would clearly have a substantial impact on the property's market value, yet at the sale Wham informed one prospective buyer that he intended to retain the license on the adjacent property, and that as a result any purchaser of the leasehold would be unable to obtain a liquor license.

---

[2]We note that any discussion is complicated by the fact that part of the purchase price was undoubtedly intended to secure the leasehold, which could not be transferred under Article Nine.

These actions clearly had a detrimental effect on the price the property could be expected to bring at any sale, and indicates that Wham did not sell the collateral "in its then condition or after commercially reasonable preparation or processing." *See* NRS 104.9504(1). That Wham was able to acquire the property at a greatly reduced price demonstrates the adverse result of his activities. Given Wham's actions and the attendant effect on the market value of the property, we believe that the district court erred in finding the sale of the collateral was conducted in a commercially reasonable manner. Accordingly, the sale must be set aside.

## CONCLUSION

The preceding discussion demonstrates that the district court erred in allowing Wham to take possession of the leasehold pursuant to an Article Nine security agreement, and further erred in finding that the sale of the remaining collateral was commercially reasonable. Further, it is clear that the district court's error fatally infects the damages award. The court awarded money damages to Wham in the amount of $17,768.70, reaching this figure by subtracting the $20,050 that Wham bid at sale from the $37,818.70 Wham expended "maintaining" the collateral during the pendency of the litigation. The record indicates, however, that over $20,000 of the $37,818.70 allegedly expended by Wham represented rent and maintenance costs on the leasehold. As Wham clearly was never entitled to possession of the leasehold, the district court's computation is erroneous.

We are left with the question of what relief is appropriate in the factual setting of this case. Initially, we note that the district court found that $11,500 was still owing on the Diercks note to Mazzuca, which was purchased and held by Wham. As we perceive no error in the district court ruling that the "finder's agreement" purportedly entered into between Diercks and Mazzuca was not sufficiently established, Wham was entitled to this sum.

It is equally clear, however, that Article Nine afforded Wham no right to take possession or dispose of the leasehold. Accordingly, the leasehold interest in the property must be returned to Diercks. Further, in that Wham utilized the property for his own purposes during the pendency of the litigation, Diercks is entitled to recover the reasonable use value of the property. This use value, however, must be adjusted by taking into account those amounts which Wham paid as rent to the third party lessor, and by other appropriate adjustments for any expenditures which Wham was constrained to make to

maintain the property, and which reduced the leasehold's use value.

As to the collateral actually subject to a security interest—the "furniture, fixtures, equipment, appliances and stock-in-trade" listed in the security agreement—we note that Article Nine provides statutory relief for a debtor injured by a creditor's deviation from the requirements governing sales of collateral. NRS 104.9507(1) provides that the injured debtor has a right to recover from the secured party any loss caused by a failure to comply with the provisions governing sales of collateral. Accordingly, on remand the district court should determine, by appropriate means, the loss to Diercks resulting from Wham's use and depreciation of the collateral and the commercially unreasonable sale, this amount to be deducted from the original $11,500 still due and owing on the Mazzuca note. Wham and his successors are not entitled to credit for expenditures made while Wham has been using this property in his business enterprise.

The other contentions raised by the parties have been considered and are without merit. This case is therefore reversed and remanded with instructions that the district court proceed in a manner consistent with the preceding discussion. *Inter alia,* of course, the district court should fully rehear issues relating to attorneys' fees, taking into account the value of counsel's various services as disclosed by the court's ultimate resolution of this matter.

MANOUKIAN, C. J., SPRINGER, MOWBRAY, and GUNDERSON, JJ., and ZENOFF, SR. J.,[3] concur.

---

[3]The Chief Justice designated THE HONORABLE DAVID ZENOFF, Senior Justice, to sit in this case in place of THE HONORABLE THOMAS L. STEFFEN, Justice, who was disqualifed. Nev. Const., art. 6, § 19; SCR 10.