JACK K. LEAVITT, DOROTHY M. LEAVITT and JACK K. LEAVITT, as Receiver of ASPEN INN CORPORATION, Appellants, v. LEISURE SPORTS INCORPORATION, a Nevada Corporation; MT. HOLLY SKI CORPORATION, a Utah Corporation; CONRAD H. KONING and AMY J. KONING, Individuals, Respondents.

No. 15324

March 30, 1987                              734 P.2d 1221

*Gifford & Vernon* and *Steven Glade,* Las Vegas, for Appellants.

*Combs, Curtas & Smith, Richard Segerblom,* Las Vegas, for Respondents.

# OPINION

By the Court, GUNDERSON, C. J.:

This is an appeal from a judgment whereby the district court determined appellants had failed to prove, to the court's satisfaction, that respondents had been guilty of actionable conduct. We cannot fault the district court's findings and, therefore, affirm the judgment.

## The Facts

Conrad and Amy Koning (the Konings) determined that an area of Mount Holly, Utah, had potential for development as a ski resort. In 1969, they formed Leisure Sports Incorporation (LSI) and negotiated with the State of Utah for a lease of the state owned land.

Jack and Dorothy Leavitt (the Leavitts) were neighbors of the Konings. These two couples became friends and, as a result, socialized together. In fact, the Leavitts visited the Mt. Holly area with their friends on several occasions. After discussion, the Leavitts decided to join the Konings in developing a hotel on the Mt. Holly land. Jack Leavitt was experienced in real estate and felt that this would be a profitable business venture. A preliminary agreement and memorandum of intent was drafted by Jack Leavitt. The stated purpose of the agreement was that the parties associate in order to develop, manage, and hold the planned hotel for investment purposes. The two couples formed Aspen Inn Corporation (AIC) in order to pursue this joint endeavor. Each couple contributed approximately $29,000 to the corporation and in return, received fifty percent (50%) of the corporation's stock. Each of these four people held a position as an officer and director of AIC.

The Konings' contribution to AIC was the value of the leased land ($26,100) and $3,000 in cash. Under this arrangement, AIC paid no rent. However, an annual fee was paid by AIC (via LSI) to the State of Utah. This fee was paid for three years by Dorothy Leavitt as secretary-treasurer of AIC.

We note that prior to the formation of AIC, the Leavitts were aware of LSI and that the Konings were the officers, directors and

shareholders of that corporation. Also, in 1972, the Konings formed another corporate entity. Mt. Holly Ski Corporation (MHSC) provided certain services such as snow and garbage removal to the tenants in the Mt. Holly area. Again, the Leavitts were aware of MHSC and that the Konings acted as the officers, directors and shareholders of this corporation.

AIC obtained a loan from United Mortgage Trust (UMT) in order to build its hotel. The loan of $105,000 was secured by a first trust deed on the hotel. Pursuant to the loan documents, UMT did *not* receive an interest in the lot, and the Leavitts and Konings were made guarantors of the loan to AIC. The hotel was built and opened for business in 1973. By 1974, AIC was seeking a buyer for the hotel. The relationship between the Leavitts and the Konings was deteriorating. The hotel had failed to produce a profit for any given quarter of its operation and both couples had contributed capital beyond that of their initial contribution.

In late 1975, AIC had three offers for the purchase of the hotel. Two offers were favored by the Konings because the buyers were willing to make a substantial down payment. The Konings felt this would result in a greater commitment to the success of the hotel. The Leavitts vetoed these offers and favored an offer by their personal friend, Paul Sprague, to whom AIC sold the hotel for $230,000 with a down payment of only $1,000. Sprague assumed the UMT first trust deed (valued at approximately $88,000) and obtained a second trust deed from AIC. The second trust deed was secured by the hotel. Additionally, LSI and AIC assigned the land lease to Sprague. LSI retained the right to pay the annual fee if Sprague failed to do so. The agreement directed that if Sprague failed to pay the fee, LSI (after due notice) could cancel the sublease and obtain possession of the property. Under such an agreement, neither AIC nor UMT would retain a security interest in the hotel if LSI cancelled the sublease. As an experienced real estate broker, Jack Leavitt understood such a result. Additionally, we note that Jack Leavitt negotiated the sale to Sprague and the necessary documents were drafted by attorney Michael Leavitt (son of Jack and Dorothy Leavitt).

After the sale of the hotel, the Leavitts and the Konings discussed dissolution of AIC. By December 15, 1975, the corporation had adopted a resolution to dissolve.

Sprague began operating the hotel in late 1975 and, after only two months, determined that the hotel was a losing venture. Sprague abandoned the hotel and defaulted on all the related obligations. UMT initiated foreclosure proceedings against Sprague. Jack Leavitt and Conrad Koning were experienced real estate brokers and were aware that foreclosure on a first trust deed could render a second trust deed valueless. Pursuant to

written agreement, LSI provided notice to AIC that the annual lease fee of $300 was delinquent.

On March 30, 1976, there was a meeting of AIC's board of directors. The Konings wanted to initiate foreclosure proceedings against Sprague in order to attempt to protect the interests of AIC. The Leavitts opposed such action and wanted to contribute funds (along with the Konings) to clear the UMT delinquency. The Konings declined to contribute funds as they were not in a position to incur such a financial obligation at the time. The Konings reiterated that Sprague had failed to make the annual lease payment and that LSI was prepared to terminate the lease if the fee was not received. Although the corporate account of AIC had dwindled to less than $500, there was enough money available at this time to pay the annual fee.

In July, 1976, LSI filed a notice to quit in order to terminate the sublease. This was four (4) months after AIC's board of directors meeting where the Konings expressed the intent of LSI to pursue this particular course of events if payment was not received. LSI re-entered the property.

By October, 1977, UMT was prepared to conduct a trustee's sale of the hotel. Prior to the trustee's sale (and purportedly upon the advice of counsel), the Konings recorded a document with the Beaver County (Utah) recorder claiming their interest in the land and hotel. Conrad Koning also appeared at the sale and announced that any buyer would not acquire an interest in the property. UMT was the sole bidder at the sale and purchased the hotel for $25,000. The Konings, however, refused to surrender possession of the hotel. UMT filed suit in Utah in order to gain access to the hotel. The Utah court determined that equity prohibited LSI's possession of the hotel and reinstated the LSI-AIC sublease. In 1980, all parties involved in the Utah litigation settled the lawsuit. UMT received possession of the hotel and, in exchange, relinquished all rights to a deficiency judgment from AIC. UMT later sold the hotel. LSI continues to hold the master lease on the lot. The settlement, however, failed to resolve any claims existing between the Leavitts and the Konings. In April, 1978, the instant lawsuit was filed by the Leavitts. The following allegations were asserted:

1. The Konings were negligent in their functioning as directors of AIC because they acted in their own interest by seizing AIC's asset.

2. The Konings failed to fulfill their obligations as per the preliminary agreement.

3. AIC was a third-party beneficiary to the master lease.

4. The Konings conspired to obtain AIC's real property.

5. The Konings converted and disposed of personal property which was contained in the hotel.

6.   LSI took possession of the hotel and retained all rents and profits. As a result, LSI was unjustly enriched.

7.   The Konings violated fiduciary duties owed to AIC.[1]

After a bench trial, the district court entered judgment against the Leavitts. The district court determined that there could be no breach of fiduciary duties because all the acts required of the parties pursuant to the preliminary agreement had been performed. Additionally, the court concluded there was insufficient proof as to any breach of fiduciary loyalties. Moreover, the district court determined that the Konings acted in good faith and attempted to preserve corporate assets. Furthermore, the court found the Leavitts had accepted the possibility that the Konings would have an adverse interest to that of AIC by virtue of various contractual arrangements. In addition, the court determined that the Leavitts had failed to sustain their burden of proof as to the existence of a civil conspiracy and failed to prove any unjust enrichment. There had been, the court noted, no showing that the Konings profited while operating the hotel. Lastly, the district court noted, the Leavitts were never able to prove to the court's satisfaction that any damages existed.

After examination of the record, we believe the appellants have failed to demonstrate that the district court erred.

### Fiduciary Duties

It is generally recognized that joint venturers owe to one another the duty of loyalty for the duration of their venture. A corporate officer or director stands as a fiduciary to the corporation. This fiduciary relationship requires a duty of good faith, honesty and full disclosure. Western Indus., Inc. v. General Ins. Co., 91 Nev. 222, 228, 533 P.2d 473, 476 (1975). Any alleged breach of such a duty is a question for the trier of fact after examination of all the evidence. Id. We also note that a corporate officer or director may contract directly with the corporation. Such contracts are valid, if at the time of their making, they are fair to the corporation. See NRS 78.140; Pederson v. Owen, 92 Nev. 648, 650, 556 P.2d 542, 543 (1976).

Here, Conrad Koning and Jack Leavitt were both experienced in real estate transactions and the effects of same. The Leavitts were guided by the advice of competent counsel during all of the agreements entered into between the parties. The Konings were

---

[1]The third and fifth allegations were dismissed at the time of trial pursuant to stipulation of the parties.

always open in their dealings with the Leavitts. When LSI negotiated the ability to foreclose on the hotel if Sprague failed to pay the lease fee, there was no objection by the Leavitts. It was not until the Konings pursued these contractual rights that the Leavitts chose to complain.

We note that the purposes for which AIC was formed had been fulfilled. AIC had intended to develop and manage a hotel. The corporate purpose ended when the hotel was sold to Sprague. In fact, the Konings and the Leavitts had adopted a resolution to dissolve the corporation. When Sprague defaulted on his obligations related to the hotel, the Konings (as LSI) exercised their rights pursuant to prior negotiated agreements. In light of all the facts existing at the time, we cannot say that the Konings breached any fiduciary duties owing to what remained of the corporate status. The record does not impel findings contrary to those of the district court.

## Corporate Opportunity Doctrine

It is also generally recognized that a corporate fiduciary cannot exploit an opportunity that belongs to the corporation. The difficulty arises, however, when attempting to ascertain if a particular opportunity "belongs" to the corporation.

We first note that the usual factual situation which evokes consideration of the "corporate opportunity doctrine" is not present here. Typically, the fiduciary is accused of diverting a business opportunity which the corporation has an expectancy interest or property right. Scrutiny generally reveals that the opportunity, in all fairness, should belong to the corporation. *E.g.*, Klinicki v. Lundgren, 695 P.2d 906, 910 (Or. 1985). This is not the scenario involved here. An agreement was reached between the parties whereby LSI could cancel the Sprague sublease. The Leavitts agreed to such an arrangement and when confronted with the reality of it, they failed to pay the $300 fee in order to protect the corporate interests about which they now express such concern. We again must point out that the Leavitts were experienced in such transactions and were always represented by able counsel. In these circumstances, it is not difficult to perceive why the trial court was unpersuaded by arguments of the Leavitts.

We agree with commentators who argue that stricter rules related to the corporate opportunity doctrine are necessary when dealing with a public corporation. A more flexible approach, however, is dictated when dealing with a small corporation which is generally contractual in nature. Brudney and Clark, *A New Look at Corporate Opportunities*, 94 Harv. L. Rev. 997 (1981).

The small number of players in a private venture result in better communication between the members. Additionally, agreements are entered into which are tailored to particular situations and objectives. We cannot say that the Leavitts proved a deprivation of any corporate opportunity owing to AIC. The record supports the trial court's determination that they failed to do so.

*Wrongful Interference With Prospective Economic Advantage*

The Leavitts also argue that the Konings wrongfully interfered with a prospective economic advantage of AIC arising from the trustee's sale. The Leavitts claim that the Konings' conduct in announcing that any buyer of the hotel would not obtain a leasehold interest in the property resulted in the low sale price of the hotel.

We note that this particular tort possesses the following elements: (1) a prospective contractual relationship between the plaintiff and a third party; (2) the defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and, (5) actual harm to the plaintiff as a result of the defendant's conduct. Buckaloo v. Johnson, 537 P.2d 865, 872 (Cal. 1975). From a review of the record, it appears the trial court could properly decide that the Leavitts failed to meet their burden of proof.

First of all, ''prospective contractual advantage'' in this situation would mean that the trustee's sale would have produced more than the approximate $88,000 owed to UMT. This would allow AIC to begin to collect on the obligation owed to it. Other than opinions rendered by the parties that they believed that the hotel's fair market value exceeded $230,000, there was no proof that the property's sale price would have exceeded the $88,000 owed to UMT. In 1979, the completely furnished hotel was advertised for sale at $165,000.00. The trial court specifically inquired as to whether an appraisal had been obtained and was informed that this had not been accomplished. We note that the hotel was built for less than $160,000 (the initial investment of the parties and the construction loan). Additionally, the hotel never produced a quarterly profit from the time of its inception. Thus, the value of the hotel could actually have been less than what was owed to UMT.

Next, and perhaps more important, we note that the Konings' conduct at the trustee's sale was privileged. Privilege can exist when the defendant acts to protect his own interest. *See* Zoby v. American Fidelity Company, 242 F.2d 76, 79-80 (4th Cir. 1957); Bendix Corp. v. Adams, 610 P.2d 24, 31 (Alaska 1980) (these

cases dealt with wrongful interference of contract which is a species of the broader tort of interference with prospective economic advantage. *Buckaloo* at 869). Here, the Konings acted to protect the interests they had acquired via a valid contract. Such action was motivated by a desire to protect these interests and is privileged.

The Leavitts direct this court to IAMA Corp. v. Wham, 99 Nev. 730, 669 P.2d 1076 (1983), whereby respondent was found to have engaged in actions which had a detrimental effect on the sale of some commercial property. The Leavitts contend that the district court should have permitted recovery pursuant to our holding in that case. We note that in the *Wham* case, the respondent was able to purchase the property at a greatly reduced price. This is not the factual situation presently before this court. The Konings were not engaging in conduct whereby they could purchase the hotel for a reduced value. They were merely informing any interested parties of a property interest they had acquired by contract. Additionally, in *IAMA Corp.*, the trial court was satisfied as to a fair market value of the involved property. Here, the trial court was not provided sufficient evidence to accomplish this task. For these reasons, *IAMA Corp.*, is distinguishable.

## Conclusion

The attempt by four friends to engage in a profitable business venture failed. Once the hotel was sold, the corporate purpose was finished. All that remained was dissolution of the corporate status. However, problems continued to haunt the parties. In response, the Konings attempted to exercise their contractual rights. The district court was required to scrutinize the Konings' conduct. As a result, the court determined that there had been no violation of fiduciary duties or any wrongful interference with prospective economic advantage. There is substantial evidence to support these determinations, and constraints of the appellate process preclude us from disturbing the judgment. Udevco v. Wagner, 100 Nev. 185, 189, 678 P.2d 679, 681 (1984). We need not consider the Leavitts' other contentions challenging various findings by the district court. We have determined these findings are also supported by substantial evidence. Accordingly, we affirm the decision rendered below.

YOUNG and SPRINGER, JJ., concur.

STEFFEN, J., with whom MOWBRAY, J., agrees, dissenting:

I respectfully dissent. In this appeal the Leavitts contend, among other things, that since the Konings were at all pertinent times officers and directors of Aspen Inn Corporation (Aspen), their conduct constituted a breach of their fiduciary duties to

Aspen and the lower court erred in not so finding. This Court has repeatedly held that reversal of a lower court's decision is appropriate where there is no substantial conflict in the evidence on any material point and the decision is manifestly contrary to the evidence. Avery v. Gilliam, 97 Nev. 181, 625 P.2d 1166 (1981). My review of the record revealed error warranting reversal.

At all relevant times, Conrad and Amy Koning were the sole officers, directors and shareholders of Leisure Sports Incorporation (Leisure). The State of Utah leased land to Leisure to develop a ski resort. Leisure subleased parcels of the land to third persons. Services at the ski resort are provided by Mt. Holly Ski Corporation (Mt. Holly). The Konings organized and were officers, directors and majority shareholders of Mt. Holly.

On July 5, 1972, the Konings and Jack and Dorothy Leavitt organized Aspen for the purpose of building a hotel at the ski resort. The Leavitts and Konings were each fifty percent shareholders. All four were directors. The officers were: Conrad Koning, President; Amy Koning, Vice-President; Jack Leavitt, Vice-President; and Dorothy Leavitt, Treasurer. As part of the capital contribution to Aspen, the Konings, through Leisure, contributed a forty-six-year sublease on one of the lots at the resort. The sublease was fully prepaid and was contributed to Aspen free and clear.

Aspen then obtained a $105,000 construction loan from United Mortgage Company (United), and built a twenty-one-room hotel on the lot. This loan was secured by a first trust deed on the hotel in favor of United. The hotel was completed in the summer of 1973.

In November, 1975, Aspen sold the hotel to Paul and Alma Sprague for $230,000. The Spragues agreed to assume the unpaid balance of the construction loan. A promissory note for $112,829.92 (the Sprague note) was also executed in favor of Aspen, secured by a second trust deed on the hotel. The sublease on the hotel land was assigned by Aspen to the Spragues. The assignment additionally provided that the Spragues would pay Leisure $300.00 per year as an annual lease fee on the hotel lot. The assignment also gave Aspen the right to cure any default under the sublease. The Spragues subsequently defaulted on their obligations to United, Aspen and Leisure.

In a letter dated March 19, 1976, addressed to Jack Leavitt, Conrad Koning called for discussion of Leisure's intention to terminate the sublease on the hotel lot for nonpayment of the $300.00 annual fee owed by the Spragues. At a directors' meeting shortly thereafter, Mr. Koning announced his intention to terminate the sublease and take over the hotel on behalf of Leisure if the $300.00 was not paid. Jack Leavitt informed Koning that his

willingness to destroy their mutual investments in Aspen to protect Leisure on a mere $300.00 debt evidenced a conflict of interest.

The Leavitts did not cure the nonpayment of the $300.00 lease fee on behalf of Aspen because "it wasn't their obligation to pay for it" and, faced with the overwhelming financial burden involved in preventing a foreclosure by United, "payment of the $300.00 would have been money down the drain."[1] In late March, 1976, the Spragues abandoned the hotel.

On July 26, 1976, the Konings entered the hotel, changed the locks and posted a sign on the door declaring the hotel to be the sole property of Leisure. On August 3, 1976, the Konings filed a "Statement of Facts and Notice of Cancellation of Leasehold" with the Beaver County Recorder in Beaver, Utah, stating that the underlying subleasehold interest was thereby cancelled and that the property, appurtenances and improvements were the sole property of Leisure.[2] The single reason for seizure of the hotel was nonpayment of the $300.00 debt owed to Leisure.

In a letter dated November 10, 1976, addressed to the Leavitts, Mr. Koning wrote:

> As you know, Leisure Sports Inc. has canceled the underlying leasehold interest on the Aspen Inn for nonpayment of the annual lease, and taken possession of the property and is now paying it's [sic] cost of operation and maintenance.
> . . . The Aspen Inn Corporation's security interest in the property are [sic] just as surely gone as if the hotel while in the hands of Sprague, being uninsured had burned down.

On February 18, 1977, Leisure transferred the hotel and leasehold to Mt. Holly in return for stock.

In October, 1977, the Konings received notice that United had elected to sell the hotel pursuant to its rights under its first trust deed. A trustee's sale was noticed for October 27, 1977, on the steps of the Beaver County courthouse. Two days before the trustee's sale, the Konings filed a "Notice of Beneficial Interest" with the Beaver County Recorder informing any potential bidders that they would not be acquiring any interest in the property whatsoever. This warning was repeated by Conrad Koning on the Beaver County courthouse steps immediately preceding the trustee's sale.

---

[1]The record indicates Aspen had only $532.27 in its account at that time.

[2]Under Utah Code. Ann. § 57-3-2 (1953), a presumption arises that a recorded writing affecting real estate gives notice to all persons of its contents.

United purchased the hotel at the trustee's sale for $25,000. The Konings refused to honor the trustee's deed for the hotel and would not surrender possession of the hotel. United then filed an action to quiet title, to obtain possession and to recover a deficiency judgment. The Konings, Mt. Holly, Leisure, Paul Sprague and the Leavitts were named as defendants. The Utah action eventually was settled by the parties and dismissed with prejudice.

Subsequently, a shareholders' derivative action was brought on behalf of Aspen by the Leavitts against the Konings, Leisure and Mt. Holly. The Leavitts also sued for damages suffered individually. The trial court found that the Konings acted in good faith and did not breach any fiduciary duty owed to Aspen. Whether the Konings were acting on behalf of Leisure, Mt. Holly, or individually, I disagree with the lower court's decision.

It is well established that corporate officers and directors have a fiduciary relationship with their corporation. Among those duties which officers and directors owe their corporation are undivided loyalty, good faith, honesty and full disclosure. Western Indus., Inc. v. General Ins. Co., 91 Nev. 222, 533 P.2d 473 (1975); Nicholson v. Evans, 642 P.2d 727 (Utah 1982).

These duties extend to all the corporation's assets. Officers and directors are "obligated to use their ingenuity, influence, and energy, and to employ all the resources of the corporation, to preserve and enhance the property and earning power of the corporation, even if the interests of the corporation are in conflict with their own personal interests." Nicholson, 642 P.2d at 730.

Moreover, as Justice Oakes stated in Nicholson:

> The duty of the directors of a corporation is to further the interests and business of the association and to conserve its property. Any action on the part of directors looking to the impairment of corporate rights, the sacrifice of corporate interests, the retardation of the objects of the corporation, and more especially the destruction of the corporation itself, will be regarded as a flagrant breach of trust on the part of the directors engaged therein [citation omitted].

Id.

In the present case, it is the Konings' conduct with respect to the major asset of Aspen, the hotel, which gives rise to a breach of their fiduciary duty. The Konings allege that Leisure's termination of the sublease was consistent with its express terms and therefore no fiduciary duty was breached. Nevertheless, the relevant inquiry is not whether Leisure acted properly, but whether the Konings acted improperly as directors and officers of Aspen. An officer may be subject to liability when his acts or omissions

constitute a breach under the general principles applicable to the performance of his trust. Bancroft-Whitney v. Glen, 411 P.2d 921, 936 (Cal. 1966).

Assuming Leisure had a legally enforceable claim upon the hotel's title as a result of the nonpayment of the $300 debt, good faith required Leisure, and necessarily the Konings, being officers and directors of both Leisure and Aspen, to take the hotel *subject to* the existing security interests of United and Aspen. The record discloses, of course, that the Konings had actual notice of both security interests. However, the Konings, through Leisure, recorded a document that gave notice to all persons that "the underlying subleasehold interest in Lot 16C is hereby cancelled . . . and the leasehold property, appurtenances and improvements are the sole property of the Lessor, LSI [Leisure]. . . ." Moreover, Mr. Koning wrote the Leavitts, informing them that Aspen had no security interest in the hotel. Finally, after transferring the hotel to Mt. Holly in exchange for stock, Mr. Koning, as president of Mt. Holly, recorded a document warning any bidders that they would be acquiring no interest in the property whatsoever and repeated this warning at the trustee's sale on the Beaver County courthouse steps.

While Aspen's treasurer, Dorothy Leavitt, did not pay the annual lease for reasons specified in the statement of facts, *supra,* Mr. Koning, president of Aspen, made no effort himself to pay the $300 allegedly owed to Leisure although he had authority to write checks on the corporation's account.[3] Despite the fact that the Konings were officers and directors of Leisure and Mt. Holly, they were likewise officers and directors of Aspen and therefore bound by fiduciary duties to the latter corporation. Compliance with such duties is critical when the corporation is in financial difficulty, as was Aspen. *See Nicholson, supra,* 642 P.2d at 730. As corporate fiduciaries, the Konings were charged with the responsibility of protecting Aspen's interests. The Konings' conduct surrounding the hotel's seizure and its subsequent sale was performed in a manner hostile to Aspen's interest and brazenly inconsistent with the undivided loyalty to which Aspen was entitled.

---

[3]The sublease was initially conveyed to Aspen fully prepaid in exchange for Aspen stock. It is unclear on the record why the $300 annual fee established in the assignment of the sublease to the Spragues should not have inured to the benefit of Aspen. It is also unclear why any default in the payment of such an annual fee by the Spragues would operate as a default against Aspen since the latter party presumably had paid full consideration for the fully prepaid sublease. There was clearly no obligation under the terms of the sublease for Aspen to pay Leisure the $300 annual fee which apparently was remitted each year to the State of Utah.

Moreover, where a foreclosure sale of property securing a debt has been tainted with fraud, misconduct or unfairness, the debtor will have either a complete defense to an action to collect the debt, or a setoff against the debt for impairment of security. 59 C.J.S. *Mortgage* § 599 (1949). It would thus appear that Aspen's claim against the Spragues on the underlying debt may be vulnerable to the challenge that the debt was discharged when Aspen's president breached his fiduciary duty and impaired the security for the debt at the trustee's sale.

As a result of the Konings' conduct, it is difficult to determine what amount the trustee might have secured beyond the balance due on United's priority debt if the sale had been free of burdens attributable to the Konings' actions. Concerning the question of ascertaining imprecise damages, this Court held in Bader v. Cerri, 96 Nev. 352, 609 P.2d 314 (1980), that:

> The rule against the recovery of uncertain damages generally is directed against uncertainty as to the existence or cause of damage rather than to measure or extent [citations omitted]. However, if there is evidence that damage resulted from the defendant's wrongful act and a reasonable method for ascertaining the extent of damage is offered through testimony, the fact that some uncertainty exists as to the actual amount of damage sustained, does not preclude recovery. Brown v. Lindsay, 68 Nev. 196, 228 P.2d 262 (1951). It is sufficient if the evidence adduced will permit the jury to make a fair and reasonable approximation.

In addition, the United States Supreme Court in Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555 (1931), held that:

> [t]he wrongdoer is not entitled to complain that they [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise [citation omitted]. As the Supreme Court of Michigan has forcefully declared, the risk of uncertainty should be thrown upon the wrongdoer instead of upon the injured party.

Given the great discrepancy between the fair market value of the hotel property, being approximately $230,000, and the bid price of $25,000, it can be said with reasonable certainty that damage did occur. Koning willfully sabotaged the trustee's sale and should therefore bear the risk of any uncertainty in the amount of damages.

I am therefore satisfied that judgment should have been entered against the Konings for one-half the balance of the Sprague note,

plus costs and interest.[4] Moreover, to insure that the Konings could not profit from their wrongdoing, they should not be allowed to share in or enjoy any portion of such a judgment. In my view, judgment should therefore be entered in favor of Jack and Dorothy Leavitt individually. *See* Pearlman v. Feldman, 219 F.2d 173 (2d Cir. 1955); Atkinson v. Marquart, 541 P.2d 556 (Ariz. 1975). In addition to the amount of one-half of the Sprague note, the Leavitts and Aspen were forced to incur attorney's fees for having to defend themselves in the Utah action because of the Konings' and Leisure's wrongful refusal to honor the trustee's sale deed. These damages may be precisely established and should likewise be recovered. Accordingly, I would direct that judgment be entered against the Konings reflecting such an amount.

As a final point, since in my view the Konings should be obligated to pay one-half of the note secured by the second trust deed, it would follow that the Konings, upon making such payment, would succeed to Aspen's position vis-a-vis the Spragues. Then, if the Spragues were determined to be liable for any portion of the Sprague note, despite the Konings' conduct, the Konings necessarily would be entitled to that sum.

Since my review of the record reveals unwarranted overreaching amounting to a clear breach of fiduciary duty by the Konings, I would reverse the judgment of the trial court as noted above. I therefore respectfully dissent from the opinion of my brethren in the majority.

---

[4]Since the Leavitts owned fifty percent of the Aspen stock, their share of the recovery on the Sprague indebtedness would have been one-half of the balance collected on the note.