# United States Court of Appeals
## For the First Circuit

No. 15-1157

HARLEY-DAVIDSON CREDIT CORP.,

Plaintiff, Appellee,

v.

MARK B. GALVIN,

Defendant, Appellant,

RASAIR, LLC,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Kayatta, Circuit Judges.

Timothy Chevalier, with whom McCandless & Nicholson, PLLC,
was on brief, for appellant.
Mark W. Thompson, with whom Wong Fleming was on brief, for
appellee.

December 8, 2015

**LYNCH**, **Circuit Judge**. Under the terms of a security agreement assigned to it, Harley-Davidson Credit Corp. ("Harley-Davidson") seeks to collect $108,681.50 from Mark B. Galvin. Galvin is the guarantor of a defaulted promissory note on a loan secured by an interest in a Cessna 421C aircraft ("the Aircraft"). The suit is for the deficiency balance that remained due after Harley-Davidson repossessed and sold the Aircraft through a third-party dealer for $155,000.00.

Galvin disputes the extent of his liability on the grounds that Harley-Davidson's disposition of the Aircraft was not "commercially reasonable," a requirement set forth in the security agreement and Nevada commercial law, which the parties had selected to govern their contract.

On a motion for summary judgment, the district court held that there was no dispute of material fact that the sale was "commercially reasonable" and entered partial summary judgment in favor of Harley-Davidson, denying only its request for attorney's fees. Galvin filed a motion for reconsideration, which was denied. The court later granted a separate motion by Harley-Davidson for attorney's fees. Galvin appeals from the entry of summary judgment and the denial of his motion to reconsider. We agree with Galvin that a genuine dispute of material fact exists as to whether the sale was "commercially reasonable." We reverse and remand.

On review of summary judgment, we recite the facts in the light most favorable to the non-moving party and "draw all reasonable inferences in his favor." Ray v. Ropes & Gray LLP, 799 F.3d 99, 104 (1st Cir. 2015). In April 2008, Eaglemark Savings Bank ("Eaglemark") loaned RASair, a New Hampshire LLC that managed and operated private aircrafts, $250,000 for the purchase of a Cessna 421C Aircraft, in exchange for an "Aircraft Secured Promissory Note" ("the Note") for the full amount of the loan and an "Aircraft Security Agreement" ("the Agreement") giving Eaglemark a first priority interest in the Aircraft. Mark Galvin, a pilot and the owner of RASair, personally guaranteed payment of the loan. Eaglemark assigned the Note and the Agreement (together "the Loan Documents") to Harley-Davidson.

More than two years later, in August 2010, RASair defaulted on the Note. Exercising its right under the Loan Documents to sell the Aircraft in order to reduce the balance owed, Harley-Davidson arranged for Specialty Aircraft Services, Inc. ("Specialty"), a dealer specializing in the sale of repossessed aircraft, to help. William O'Brien communicated with Galvin on behalf of Specialty.

On August 24, 2010, O'Brien wrote in an email responding to Galvin's question about a potential sale price that, "[d]epending on the actual paint and boot condition, we will

advertise around 225-230 [thousand] / Expect 180-200 [thousand] within 90 days."  In that email, O'Brien then asked Galvin about the Aircraft's annual inspection.  Galvin responded that the plane would need a "fresh" inspection, elaborated on the Aircraft's condition, and stated, "[e]verything else good."

Despite Specialty's request, Galvin did not deliver the plane to Specialty in 2010.  In January 2011, Galvin emailed O'Brien to tell him that a mechanic had identified damage to the plane's rudder caused by exposure to "heavy winds," which had rendered the Aircraft unmovable.  In March 2011, Galvin emailed Mark Strassel, Director of Operations, Aircraft, at Harley-Davidson, and explained that, in coordinating the rudder's repairs, Galvin had looked into having a Cessna dealership, Maine Aviation, assume responsibility for the sale to see if it "made a better situation," but that "[he didn't] see any advantage to them as a broker over your guy in Florida," referring to O'Brien.  On September 6, 2011, Harley-Davidson repossessed the Aircraft and moved it to Florida and into Specialty's custody.

On September 7, 2011, Strassel informed Galvin that one of the plane's logbooks was missing.  Galvin testified that he immediately "sent it overnight via UPS, insured for $5,000., [sic] directly to Mr. O'Brien per instructions received from Mr. Strassel."  The parties agree that a missing logbook would decrease the plane's value.

- 4 -

Galvin testified that when he called Specialty on behalf of a potential buyer on November 4, 2011, he learned that while in Specialty's possession, the Aircraft had been vandalized and equipment from its audio panel taken. Galvin also testified that when he then tried to locate advertising materials related to the Aircraft on Specialty's website and "Controller," a prominent aircraft sales website where aircraft are listed for sale, he found none. Galvin emailed O'Brien, who responded that Specialty was "looking for bids on the aircraft," but that the plane needed "some exh[aust] work, the autopilot is inop[erable] and the pressurization is only 3.0 differential." O'Brien instructed Galvin to have the buyer call him and said the plane was in fact listed on Controller. Galvin testified that after his communications with Specialty and O'Brien, he "dropped the potential buyer."

On November 30, 2011, Harley-Davidson executed a purchase agreement for the plane with an individual buyer for $155,000. According to the purchase agreement, the Aircraft was sold in an "as is" condition, and the buyer waived any warranty with respect to the plane's "airworthiness." In the agreement, Harley-Davidson promised to replace the missing avionics components, "a Garmin 530, Garmin 340 and Garmin 327," no later than December 5, 2011. An invoice for the avionics as well as additional repairs is dated December 9, 2011, the same as the

- 5 -

purchase agreement's stated closing date. Following the sale, Harley-Davidson calculated the outstanding debt, deducted the costs of repairs to the audio panel, and sent Galvin a letter requesting $108,681.50.[1]  Galvin did not pay.

II.

On October 5, 2012, Harley-Davidson filed a breach of contract action against Galvin and RASair to collect the $108,681.50 deficiency in New Hampshire district court, pursuant to 28 U.S.C. § 1332(a) diversity jurisdiction.

The district court entered default judgment against RASair on March 12, 2013.  On June 5, 2013, Harley-Davidson moved for summary judgment against Galvin, Fed. R. Civ. P. 56, which the court denied without prejudice.  On May 23, 2014, after further discovery, Harley-Davidson renewed its motion for summary judgment.  Galvin opposed the motion on the grounds that Harley-Davidson failed to comply with the Loan Documents and a provision of the Nevada Commercial Code, Nev. Rev. Stat. Ann. § 104.9610,

---

[1]  The district court explained Harley-Davidson's calculations: "The remaining balance was determined as follows in accordance with paragraph ten of the Aircraft Security Agreement: At the time of the sale, the total amount due to Harley-Davidson from RASair was $261,681.50, which included $243,162.98 owed under the Loan Documents, $7,750 for a Repossession/Broker Fee, $375 in Escrow Fees, and $12,393.52 in Aircraft Repairs, Storage, and Maintenance.  The Aircraft was sold for $155,000, which resulted in a remaining balance of $108,681.50."

requiring disposition of collateral after a debtor's default to be "commercially reasonable."[2]

Under Nevada commercial law, which follows the Uniform Commercial Code ("UCC"), one method of demonstrating that a disposition was "commercially reasonable" is to show that the disposition was conducted "in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." Nev. Rev. Stat. Ann. § 104.9627(2)(c); see U.C.C. § 9-627 (2000).

On September 4, 2014, the district court granted partial summary judgment for Harley-Davidson, finding that Galvin had not raised a genuine issue of material fact as to the commercial reasonableness of the sale. Stating that "selling repossessed collateral through a dealer, if such sale is 'fairly conducted, is recognized as commercially reasonable,'" Harley-Davidson Credit Corp. v. Galvin, No. 12-cv-374, 2014 WL 4384632, at *3 (D.N.H. Sept. 4, 2014) (quoting Jones v. Bank of Nev., 535 P.2d 1279, 1282 (Nev. 1975)), the district court credited that Harley-Davidson had employed a recognized dealer of repossessed aircraft. Although

---

[2] Nevada Revised Statutes § 104.9610(2) provides as follows: "Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms."

not expressly stating so, the district court appears to have relied on that finding in determining that Harley-Davidson satisfied its initial burden at summary judgment to show commercial reasonableness, such that the district court, citing Colonial Pac. Leasing Corp. v. N & N Partners, LLC, 981 F. Supp. 2d 1345, 1349-50 n.1 (N.D. Ga. 2013), shifted the burden of proof to Galvin to raise a genuine issue of material fact. The district court rejected Galvin's arguments, inter alia, that Specialty's response to the vandalism of the Aircraft led to a diminished sales price and was commercially unreasonable. The district court held that, "Galvin has raised no genuine issues of material fact concerning the commercial reasonableness of the disposition of the Aircraft." Harley-Davidson Credit Corp., 2014 WL 4384632, at *7. Galvin filed a motion for reconsideration, which was denied on December 15, 2014. This appeal followed.

III.

We review entry of summary judgment de novo, Ray, 799 F.3d at 112, and denial of a motion for reconsideration for abuse of discretion, Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 930 (1st Cir. 2014).

We hold that the district court's analysis of Harley-Davidson's motion for summary judgment prematurely shifted the burden of proof onto Galvin. Evaluating the record under the correct standard, we find that a genuine dispute of material fact

- 8 -

exists regarding whether Specialty's handling of the damage to the Aircraft caused by the vandalism that occurred while in its custody rendered Harley Davidson's disposition of the Aircraft commercially unreasonable. For the reasons explained below, we reverse the district court's judgment and remand.

A. Burden of Proof

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When the movant bears the burden of proof at trial, he must demonstrate every element of his case such that "no reasonable trier of fact could find other than for [him]." Lopez v. Corporación Azucarera de P.R., 938 F.2d 1510, 1516 (1st Cir. 1991) (quoting Paul v. Monts, 906 F.2d 1468, 1474 (10th Cir. 1990) (per curiam)). If he does so, the burden shifts to the nonmovant to establish that a genuine material dispute exists. See id. at 1517.

The district court and the parties all agree that Nevada Revised Statutes § 104.9610(2) places the burden on Harley-Davidson to show at trial that the sale of the Aircraft was "commercially reasonable," and so we assume without deciding that this interpretation of Nevada law is correct. As Harley-Davidson is the party moving for summary judgment and the party who bears the burden of proof on the issue of commercial reasonableness at trial, Harley-Davidson bears the burden of proof at summary

- 9 -

judgment to show that no reasonable trier of fact could find other than that the sale was "commercially reasonable." See Lopez, 938 F.2d at 1516.

The district court prematurely shifted the burden of proof onto Galvin. Under Nevada law, a creditor may demonstrate that a sale through a dealer was "commercially reasonable" by showing that the sale was conducted "in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." Nev. Rev. Stat. Ann. § 104.9627(2)(c). The district court and Harley-Davidson point to Jones v. Bank of Nevada, 535 P.2d 1279 (Nev. 1975), to suggest that using a dealer alone meets this requirement.

Reliance on Jones is misplaced. In reviewing a sale of collateral, the Jones court explained the rationale of a trial court by noting the trial court's quoting of a comment to a former provision of the UCC. Id. at 1282. That comment, no longer existent in the UCC, stated that a sale through a dealer, if "fairly conducted, is recognized as commercially reasonable," id. (quoting UCC § 9-507, cmt.). But Jones did not hold that using a dealer alone qualifies a sale as "commercially reasonable" regardless of whether the sale was "fairly conducted." Indeed, it rather plainly states the opposite: use of a dealer must also be "fairly conducted." Id. at 1282. Harley-Davidson points to no Nevada authorities supporting the district court's holding that a

- 10 -

creditor's use of a dealer alone demonstrates commercial reasonableness, and we find none.[3]

The district court erred in shifting the burden of proof to Galvin. Cf. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (holding that when the nonmoving party bears the burden of proof at trial, the moving party may obtain summary judgment by showing that "there is an absence of evidence to support the non-moving party's case").

B.    Genuine Dispute of Material Fact

Our task is to determine, viewing the record in the light most favorable to Galvin, whether any reasonable trier of fact could find other than that the sale was "commercially reasonable" within the meaning of Nevada Revised Statutes § 104.9610. See Lopez, 938 F.2d at 1516. We conclude that there is a genuine dispute of material fact, such that a reasonable trier of fact could find against Harley-Davidson.

_____

[3]    We need not and do not decide the weight Nevada law gives to a creditor's use of a dealer in most circumstances. We note that even were we to accept Harley-Davidson's suggestion that, once a dealer is used, it is the debtor's burden to show that the sale "was in some manner atypical," here, there is more than enough to find that the circumstances were "atypical." Significant damage occurred to the plane because of vandalism while in the dealer's custody; the plane was rendered not airworthy as a result. Under such conditions, even assuming use of a dealer were as significant as Harley-Davidson contends, it is not enough for the creditor to point to the mere fact that a dealer was used, especially where the governing statute requires that it show "[e]very aspect of a disposition" was "commercially reasonable." Nev. Rev. Stat. Ann. § 104.9610(2).

- 11 -

Harley-Davidson asserts that the sale of the Aircraft was "commercially reasonable" because of its use of a dealer. We have already rejected that fact alone as insufficient. Rather, Harley-Davidson must show that in these particular circumstances, where the repossessed collateral was vandalized while in the dealer's care such that the plane could not be flown, that Specialty's disposition of the Aircraft was "in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." Nev. Rev. Stat. Ann. § 104.9627(2)(c); see Royal W. Airways, Inc. v. Valley Bank of Nev., 747 P.2d 895, 897 (Nev. 1987) (per curiam) (holding that "neglect of the [repossessed] airplane and the change in its market value" while in the creditor's possession failed to satisfy the creditor's duty to "dispose" of the collateral and remanding to determine whether the conduct was commercially unreasonable); Iama Corp. v. Wham, 669 P.2d 1076, 1079 (Nev. 1983) (scrutinizing actions of creditor while in possession of collateral).

Harley-Davidson also contends that Galvin's consent to using Specialty as a dealer and alleged "participation" in the sale rendered the sale "commercially reasonable." Harley-Davidson has pointed to no Nevada authorities to support this interpretation of Nevada law. Rather, relying on Piper Acceptance Corp. v. Yarbrough, 702 F.2d 733 (8th Cir. 1983) (per curiam) (applying Arkansas law), a case in which a debtor's lawyer wrote to a

- 12 -

creditor, "go ahead and sell the airplane without our having checked it further," id. at 734, Harley-Davidson suggests that express authorization "arguably makes the question of commercial reasonableness of the sale immaterial," id. at 735. To begin, the court in Piper did not hold that consent to sale through a dealer renders a sale "commercially reasonable." But in any event, this case is distinguishable, as there is no evidence on the record that Specialty ever informed Galvin of the November 30 sale, much less that Galvin gave his "express authorization."[4]

On these arguments, a reasonable trier of fact could decide against Harley-Davidson. Furthermore, we agree with Galvin that there is a genuine dispute of material fact as to whether Specialty's handling of the sale after the vandalism fell below the standard of reasonable commercial practices among such dealers. Galvin contends the Aircraft's missing avionics would likely have turned away buyers. See Levers v. Rio King Land &

---

[4]     We are also not persuaded by Harley-Davidson's citation to Ralston-Purina Co. v. Bertie, 541 F.2d 1363 (9th Cir. 1976) (applying Idaho law). In Bertie, a chicken farmer's poultry inventory was repossessed and sold by Ralston-Purina Company for a supply-feed debt secured by the inventory. Id. at 1364-65. The trial court made an evidentiary ruling disallowing Bertie's testimony as an expert for his defense on the basis that he conceded he was "well informed" about and had "participated in the disposition of the live chickens," yet "he and his wife had not attempted to enjoin or restrict" the disposition, despite having the ability to do so under Idaho law. Id. at 1366. The appeals court was listing the evidentiary basis for the trial court's application of Idaho estoppel law -- the case is not on point.

Inv. Co., 560 P.2d 917, 920 (Nev. 1977) (considering number of potential buyers); Jones, 535 P.2d at 1281 (considering seller's efforts to attract buyers). The district court found Galvin had not properly supported that contention because he "simply points to his own affidavit." While self-serving affidavits that do not "contain adequate specific factual information based on personal knowledge" are insufficient to defeat summary judgment, Spratt v. R.I. Dep't of Corr., 482 F.3d 33, 39 (1st Cir. 2007) (quoting Quinones v. Buick, 436 F.3d 284, 290 (1st Cir. 2006)), Galvin's personal knowledge is backed up by thirty years of experience as a private pilot, having purchased and sold at least seven aircraft, and having owned and operated three aviation-related businesses. He testified, "[t]he missing avionics and resulting questionability to the history of the aircraft, would turn away all but those who . . . 'bottom fish' for bargains," resulting in lower offers. And beyond his affidavit, the record also contains the purchase agreement between Specialty and the individual buyer. Replacement of the avionics was specifically written into that agreement, which strongly indicates that having the avionics was important, as the buyer insisted upon their replacement as a condition of the sale.

We note that although O'Brien's November 5, 2011, email states that Specialty was "looking for bids on the aircraft," that evidence does not show buyers were as interested in the plane as

- 14 -

they would have been had the vandalism been corrected prior to marketing of the plane or had the vandalism been prevented in the first place. The fact that "Specialty encouraged Galvin to have an allegedly interested party contact it about purchasing the Aircraft," does not alter our conclusion that, in light of all the evidence, viewed most favorably to Galvin, a reasonable trier of fact could find Specialty's actions dissuaded buyers.

Galvin also contends that Specialty sold the Aircraft for an "unreasonably lower sales price" as a result of the vandalism.[5] Under Nevada law, "[a]lthough the price obtained at the sale is not the sole determinative factor, nevertheless, it is one of the relevant factors in determining whether the sale was commercially reasonable." Levers, 560 P.2d at 920; see also FDIC v. Moore Pharm., Inc., No. 2:12-cv-00067, 2013 WL 1195636, at *3 (D. Nev. Mar. 22, 2013) ("The conditions of a commercially reasonable sale should reflect a calculated effort to promote a sales price that is equitable to both the debtor and the secured creditor." (quoting Dennison v. Allen Grp. Leasing Corp., 871 P.2d 288, 291 (Nev. 1994) (per curiam))). Galvin points to the allegedly low invoice prices Harley-Davidson submitted as evidence

---

[5] We need not decide how wide a discrepancy in price and value of collateral must be to trigger "close scrutiny" under Nevada law, Levers, 560 P.2d at 920, as the vandalism alone gives us reason enough to scrutinize the sale. And in any case, Nevada Revised Statutes § 104.9610(2) requires "[e]very aspect of a disposition of collateral" to be "commercially reasonable."

- 15 -

that the Aircraft was not properly repaired, and that if not properly repaired, it was likely sold as not airworthy and would have obtained a lower price. Although Harley-Davidson has argued the plane was in poor condition and damaged when delivered to Specialty, it has not disputed Galvin's testimony that the plane was nonetheless airworthy before the vandalism. The November 30, 2011, purchase agreement, however, states that the plane is being sold "as is" and expressly disclaims its "airworthiness." Given the facts on the record, there is a genuine dispute of material fact regarding whether the vandalism's effect on the plane's airworthiness may have affected the price obtained. This conclusion is not altered by damage that already existed at the time of repossession. Simply put, a fact-finder could reasonably conclude that an airworthy craft would attract more interest and a higher price than would a non-airworthy craft that had been vandalized, even if the seller promised to repair the known damage. With the latter craft, the buyer may wonder what else happened to the plane and has no chance to test it out.[6]

Harley-Davidson attempts to show that "Galvin did not expect the Aircraft to sell for a significantly higher price than it did," pointing to an email exchange between O'Brien and Galvin

_____

[6]     We do not reach Galvin's arguments that the sale was not an arm's-length transaction or that the plane was not sold in its "present condition," as they were not raised below.

- 16 -

in which O'Brien informed Galvin, "[e]xpect 180-200 within 90 days."  In reply, Galvin responded to O'Brien's other remarks and then affirmed, "[e]verything else good."  Galvin has not disputed that he made that statement.  However, he has not admitted that stating "[e]verything else good," referred to the potential price and not to the plane's condition being otherwise good.  Galvin also points to Bluebook values for the make and model of his plane showing average retail values of approximately $269,000.  It is possible that a trier of fact may determine that Galvin should not receive $269,000, and instead should receive at most $200,000, as the maximum amount he expected.  However, we cannot say that no reasonable trier of fact would find he should have received more than $155,000, and that at least some of the difference between the expected and received value was due to Specialty's handling of the vandalism.

Based on these facts, we find Harley-Davidson has failed to show that no reasonable trier of fact could find other than that the sale was "commercially reasonable."  Summary judgment should have been denied.  That said, we note that given the amount in dispute, we see no reason why the parties should not be able to resolve this matter without further costly litigation.

We need not reach Galvin's motion for reconsideration.

IV.

For the reasons stated, we reverse and remand.

- 17 -