RICHARD GOLDEN AND AUDREY Y. GOLDEN, APPELLANTS, v. BILL YONEMA TOMIYASU, KIYO TOMIYASU, UWAMIE TOMIYASU, AND NANYU TOMIYASU, RESPONDENTS.

No. 4625

December 23, 1963                    387 P.2d 989

[Rehearing denied January 21, 1964]

*Babcock & Sutton,* of Las Vegas, for Appellants.

*Harry E. Claiborne,* of Las Vegas, for Respondents.

## OPINION

By the Court, BADT, C. J.:

This was an action to set aside a trustee's sale on foreclosure of a deed of trust. We hold that mere inadequacy of price, without proof of some element of fraud, unfairness or oppression as accounts for and brings about the inadequacy of price is not sufficient to support a judgment setting aside the sale.

The Tomiyasus had executed a second deed of trust to a trustee to secure the payment of $13,564 to the predecessors and assignors of the First National Bank. This was subject and subordinate to a first deed of trust in the sum of $38,968.29. On default of the second deed of trust the trustee, pursuant to demand of the bank as beneficiary, proceeded to sell the property under the powers of the second deed of trust. A public sale was had, at which the Goldens became the purchasers for the sum of $18,025.73. The Tomiyasus, trustors, commenced this action in the court below to set aside the trustee's sale and to cancel and annul the deed executed pursuant thereto and tendered into court the amount of the purchase price and offered to pay any accrued costs. Such tender was made with the filing of the complaint on June 14, 1962, some 50 days after the sale.

The case was tried to the court without a jury. The court rendered judgment as prayed, setting aside the sale and annulling the deed and ordering the clerk of the court to pay to the Goldens the amount deposited by the Tomiyasus. This appeal followed.

The learned trial judge filed a written decision in which he reviewed each of the reasons advanced by respondents, why the sale should be set aside. Each of such reasons was rejected by the court as being sufficient in itself to require the setting aside of the sale, but stated that the reasons asserted and discussed in the opinion "do indicate that because of voluminous irregularities" the sale must be set aside.

Following the recitals contained in the decision, the court directed findings to be prepared, and signed the formal findings, including findings XVI and XVII which had not been mentioned in the findings contained in the written decision. The added findings are as follows:

"XVI. The court finds that the irregularities and confusion heretofore mentioned would have been, and was misleading, to prospective bidders, and would have discouraged, and did discourage, the attendance of prospective bidders at the sale, which could have, and did, result in the property being sold for an inadequate price to the injury of the trustors.

"XVII. The court finds that the trustee, Nevada Title Insurance Company, their agents and employees, in exercise of their power under the trust deed, was an agent of both parties and it was its duty on making the sale to act in good faith as an indifferent person, exercising good faith and a just and fair discretion in protecting the rights and interests of the trustors with all reasonable effort to make the sale beneficial to such parties by obtaining the full value of the property, or the best price possible, or a reasonable amount, but intentionally, or unintentionally, failed in its said duty in that regard in the manner hereinabove mentioned in these findings."

Although the evidence is in conflict, there is substantial support of the court's finding that the land has a market value of $2,500 an acre. As five acres had been released from the deed of trust, there remained approximately 80 acres valued at a total of approximately $200,-000. As against the inadequacy of the bid of $18,025.73 as compared with this valuation, the following facts should be noted:

(1) The deed of trust here involved was subject to a lien of a prior deed of trust in the sum of $38,968.29.

(2) Said first deed of trust called for monthly payments of $709.00 each.

(3) The Tomiyasus became delinquent in their payments on the first deed of trust to the extent that the First National Bank, beneficiary under the second deed of trust, was compelled to advance, up to the time of the foreclosure sale, the sum of $5,809.52. The total under the two deeds of trust amounted to approximately $57,000.

(4) The Tomiyasus were in continual default also in payments of the second deed of trust—the sum secured thereby having increased to $18,024.73 from the original indebtedness of $13,564.

(5) On October 26, 1961, the First National Bank, beneficiary under the second deed of trust, notified Nevada Title Insurance Company, the trustee, that the trustors were in default, in that the last payment on the principal had been paid in October, 1960, and interest had been paid only to March 11, 1961. Accordingly, the trustee was instructed to prepare notice of default and election to sell in accordance with the provisions of the deed of trust. Copy of the bank's said letter was mailed to Bill Yonema Tomiyasu. The notice of breach and election to sell were duly recorded as required by the deed of trust. Publication of notice of trustee's sale was duly made and notice that the publication was running was mailed to Bill Yonema, said sale being noticed for March 13, 1962, at 10 a.m., at the front entrance of the Nevada Title Insurance Company.

(6) From September to November, 1961, Bill Yonema (the father) was absent in Japan and handed the management of the property over to his son, Nanyu, who continued such management but kept his father fully advised. Bill Yonema knew of the delinquency, the imminence of foreclosure, the receipt of the notices from the trustee, and they made various attempts to refinance the loan through other sources.

(7) The advertised sale was postponed on seven separate occasions, the final sale date being April 25, 1962.

Each of such postponements was for the benefit of the Tomiyasus, who were making constant efforts to raise the necessary funds. Each postponement was proclaimed from the front door of the trustee's office. On none of these occasions did any other buyers appear. If on some of these occasions the trustee waited an additional ten or fifteen minutes before proclaiming the postponement, this cannot be termed even an irregularity. Its actual effect was to give further opportunity for bidders to appear.

(8) At the sale the agent of the trustee read the notice of the sale but when he came to the description, gave a general description of the four parcels without reading the lengthy description of the legal subdivisions, which description appears in the record as some two and one-half typewritten, legal-sized pages. All parties present knew exactly what land was being sold. He announced that, with the consent of those present, he would use that method. No objection was voiced. After reading the notice he explained that five acres had therefore been released from the deed of trust.

(9) The First National Bank, beneficiary, bid the amount of its debt, $18,024.73. The Goldens bid a few cents more and the trustee suggested that their bid should be at least $1 more, so they bid $18,025.73. There were no further bids and the property was knocked down to them for their bid.

(10) They went into the trustee's office and Mrs. Golden wrote out a personal check on the First National Bank for the amount bid. The trustee telephoned the bank and asked if it would honor said check and was advised that it would. The trustee thereupon accepted the same. At the bank this check, which was made payable to the trustee, was replaced by a cashier's check to the trustee which then drew its own check in favor of the bank, the beneficiary.

The learned trial judge held that inadequacy of price standing alone would not be sufficient to justify setting aside the trustee's sale. He also stated that the failure of the trustee to sell for cash standing by itself would seem to have little merit. He also noted that the sale

en masse and not in separate parcels was no irregularity, as it was within the discretion of the trustee and that in any event he could have received no bid if he offered the property in separate parcels. He noted the claim of irregularity in the fact that the description did not list the water well, buildings, plants, trees, and shrubbery, and was therefore inadequate. As to this, the notice of sale used the same description as that contained in the deed of trust and which also included the appurtenances.

Reference has been made to the court's rhetorical questions and its review of certain circumstances. It thought that the bid of the First National Bank of $18,024.73 should have been accepted. It asks, "Why did Mr. Adams [the vice-president and agent of the trustee] advise Mrs. Golden to increase her bid?" This could hardly be characterized as an increase. Over $18,000 in round figures, it brought the bid to $18,025.73 instead of $18,024.73. "Why did they accept a check in the amount of $1.00 more than the mortgage holder had bid?" These matters hardly require argument or answer, as the court frankly followed with this statement: "These matters do not readily convince the court that anything was wrong * * *." This in turn, however, is qualified by doubts in the court's mind as to why the trustee presumed to give the Goldens any advice. The court then ponders the question as to a possible right of redemption from the bank, which was foreclosed by the action of the trustee and the "cooperation of the defendants." As to this, the court again remarks: "This item, standing alone, would be of no particular consequence but, however, as we pass on, other comments will develop." The court then turns to the value of the land as $2,500 per acre and the sundry postponements of sale, and asks the one salient question: "Was the sale calculated to make it possible for [the Goldens] to bid without competition?" This is apparently the sole irregularity that the court did not itself dispose of.

As noted, the court's formal finding No. XVI was that irregularities in the postponements of the sale were

"misleading, to prospective bidders, and would have discouraged, and did discourage, the attendance of prospective bidders at the sale, which could have, and did, result in the property being sold for an inadequate price to the injury of the trustors." An intense examination of the entire transcript reveals that there is not a word of testimony to support this finding. During the oral argument counsel for the respondents was asked by members of this court to point to anything in the record indicating that any irregularity in the matter of any of the postponements or the proclamation thereof had any such effect or any effect damaging or prejudicial to the respondents. Counsel's reply was that the inadequacy of the price received was the damage, but was unable to point out any damage or disadvantage or harmful effect by way of preventing or discouraging the attendance of prospective bidders. As noted heretofore, no bidders, other than the parties now before the court, appeared at the original time set for the sale or at any of the postponements.

We are compelled to dispose of the various grounds on which respondents attempt to support the judgment as follows:

(1) As to the asserted deficiency in the trustee's notice of sale—this was given in strict compliance with the terms of the deed of trust and the statute.

(2) As to asserted irregularities in the sundry postponements of the sale—even assuming such irregularities—every postponement was made for the benefit of the trustors and there was no evidence that any bidders were deterred from bidding or appearing.

(3) As to the attack on the trustee's sale of the property en masse, this was entirely within the discretion of the trustee, NRS 107.030 (6), (incorporated by reference in the deed of trust), Py v. Pleitner, 70 Cal.App.2d 576, 161 P.2d 393, was pursuant to the terms of the deed of trust and the statute, and was made with the consent of all persons present.

(4) As to the release of the five-acre parcel as noted when the notice of sale was read, we can see no prejudice to any party involved. The five acres were released to the attorney for the Tomiyasus.

(5) As to the acceptance of the bidder's check in place of the cash sale required, it was immediately determined that the First National Bank, which was also the beneficiary, advised that it would honor such check, and it did so on presentation. No objection was made.

(6) As to the conduct of the trustee, the record is devoid of any evidence supporting the finding that "intentionally, or unintentionally, [it] failed in its said duty * * * to act in good faith as an indifferent person, exercising good faith and a just and fair discretion in protecting the rights and interests of the trustors with all reasonable effort to make the sale beneficial to such parties by obtaining the full value of the property, or the best price possible, or a reasonable amount * * *." The trustee gave every notice required by the terms of the trust deed and by the statute.

(7) The learned trial judge apparently thought, and respondents urge, that there was something suspicious in the fact that the trustee notified the Goldens of the sale and notified no other parties. But the Goldens, and no other parties, had asked for this information. In any event, the Goldens' bid inured to the benefit of the trustors.

(8) This leaves as our sole consideration the question whether the inadequacy of the price standing alone justified the setting aside of the sale. Respondents contend that when the inadequacy is so great as to shock the conscience, this is sufficient justification for the judgment. Respondents rely for this conclusion on the statement contained in 59 C.J.S., Mortgages § 601, at 1055–1057: "The inadequacy of the price, in order to furnish a basis for setting aside or avoiding the sale, must be gross, and such as to shock the conscience of the court, or to suggest fraud, misconduct, or the like. The inadequacy, if any, must be determined on the basis of the real value of the land at the time of the sale and its

relation to the total debt against the property, and the sale will not be set aside where there is a substantial dispute as to the market value of the property or as to the fairness of the price paid. On the other hand, where the price realized at the sale was so grossly inadequate as to shock the conscience, it may by itself raise a presumption of fraud, trickery, unfairness, or culpable mismanagement, and, therefore, be sufficient grounds for setting the sale aside. In the final analysis, the question whether the price was grossly inadequate necessarily depends on the peculiar facts of the given case." Respondents also quote the following:

"At page 1056, 59 C.J.S., Mortgages § 601, it is said:

" 'In the case of a very great disparity, the Court will be astute to extract from the facts of the case sufficient to justify it in annulling the sale by reason of mistake, surprise, unfair conduct, or the like.' "

The foregoing is just a part of a very lengthy section. Many cases are cited in the footnotes. We have studied a vast number of these cases, as well as the cases cited in A.L.R., Annot., 8 A.L.R. 1001, under the title "Sale under power in mortgage or trust deed as affected by inadequacy of price." The rule as there stated is the one cited by the learned trial judge: "Mere inadequacy of price alone is not sufficient to invalidate the sale of land under a power in a mortgage or deed of trust." In support, many cases are cited where the inadequacy of price was far greater than appears here. In the present case, accepting the court's conclusion that the value of the land was $2,500 an acre or an aggregate in round figures of $200,000 as against the aggregate debt evidenced by the first and second deeds of trust of approximately $57,-000, the property sold at approximately 28.5 percent of its value. The A.L.R. note cited refers to numerous cases in which the property was sold for a far smaller proportion of its value than 28.5 percent, in which cases the court refused to invalidate the sale. The cases cited are too numerous to discuss. It is true, as asserted by respondent, that many cases in approving the rule that mere inadequacy standing by itself is not sufficient to set aside

the sale, qualify it by saying, "unless the inadequacy is so gross as to shock the conscience." In a few jurisdictions the rule is expressed that mere inadequacy of price is not sufficient to set aside a sale unless it be so gross as to raise the inference of fraud or imposition, or similar language. However, a study of the cases indicates that the courts in thus parroting the rule had no occasion to insert the shock-the-conscience clause in the particular cases under consideration, and such quotation appeared in virtually every case to be pure dictum, as there were other elements indicating fraud or imposition on the debtor, or such irregularities as would throw doubt on the good faith of the trustee.

The reason for the insertion of such clauses seems clearly to be that courts of equity are averse to tying their hands against equitable relief whenever it might seem justifiable. It is not strange to find courts of equity thus desiring to protect themselves. They should, however, not feel under such necessity. Each case is precedent only under the facts of that case. Here we find scores of cases refusing to grant relief upon the ground of inadequacy of price alone. It should be unnecessary to qualify such holding by saying that they will not be bound to it when other factors exist.

Indeed the same language was used by this court in Dazet v. Landry, 21 Nev. 291, 298, 30 P. 1064, but it was entirely unnecessary to the decision itself and was pure dictum. The case involved the propriety of a sheriff's sale of mining property to the second highest bidder. The appellant had bid $8,500, but, not having the cash, asked for 15 minutes' time to get the money. This was granted and the sheriff requested in the presence and hearing of the plaintiff that all bidders and bystanders remain, as there would be no sale until the plaintiff's return within the time mentioned with the money to make his offer good. The people did remain and the sheriff waited 30 minutes, and as the plaintiff did not return, proceeded to resell the property and sold it to one Lacrouts for $6,100, the highest bid. This court held that no fraud or collusion was shown to exist between the officer and any bidders,

and this court affirmed the sale to Lacrouts. It will readily be seen that there was no occasion to refer to the "shock-the-conscience theory."

The early case of Runkle v. Gaylord, 1 Nev. 123 (Vol. 1–2 Nev. 100) (1865), is discussed in the A.L.R. annotation 8 A.L.R. 1001, 1010, and refers to a private sale. The court's language was quoted as follows:

"To say that a mortgagee with power to sell, who has an incumbrance on the estate of less than one-third of its value—an incumbrance which five or six months' rent will discharge—has the right to sell the estate absolutely to the first man he meets who will pay the amount of incumbrance, without any attempt to get a larger price for it, would in our opinion be equivalent to saying fraud and oppression shall be protected and encouraged."

Before using this language the court had reviewed at length facts indicating collusion and fraud. The headnote referred to the purchaser as one "who knows the mortgagee is sacrificing the property, selling it at a small fraction of its value, and that, too, when [the mortgagee] could collect his debt out of the rents in from two to five months without sale, is not an innocent vendee, and will not be protected in his purchase."

In the present case counsel for respondents, in oral argument, stated that he did not claim fraud or conspiracy but only collusion between the trustee and the high bidder. This did not exist.

Respondents insist that there is no divergence in the authorities to the effect that a judicial sale will be set aside for inadequacy of price alone when such inadequacy is so gross as to shock the conscience. Six cases are cited in support of this contention. They are cited in the margin.[1] In each of such cases the inadequacy in

_____

[1]Foge v. Schmidt, 101 Cal.App.2d 681, 226 P.2d 73; Gandy v. Cameron State Bank, 2 S.W.2d 971 (Tex.Civ.App. 1927); Linney v. Normoyle, 145 Va. 589, 134 S.E. 554; Jackson v. Fuller, 66 U.S. App. D.C. 239, 85 F.2d 816, 819; Winbigler v. Sherman, 175 Cal. 270, 165 P. 943; Bank of America Nat. Trust & Savings v. Reidy, 15 Cal.2d 243, 101 P.2d 77.

price is coupled with fraud, unfairness, concealment, oppression, or other satisfying grounds to warrant the court in its judgment setting aside the sale. Such being the case, the recital of the rule relied on by respondents is dictum.

To discuss the hundreds of cases involving attacks on public sales by trustees under the powers of a deed of trust where inadequacy of price is claimed, with or without the additional elements of fraud, would be neither necessary nor desirable. We adopt the rule laid down in Oller v. Sonoma County Land Title Company, 137 Cal.App.2d 633, 290 P.2d 880. There the suit to set aside the sale contended "that the foreclosure proceedings were improper; that the trustee was guilty of bad faith; and that the property was sold for a grossly inadequate price." The court held that when the offer "at the time and place fixed in the original notice of sale and without further publication and posting by oral proclamation, postponed the sale to a definite future date, he was acting validly within the express provisions of the deed of trust," and that " 'no other notice of postponed sale need be given.' Since the rule in this state is so well established, any discussion of the cases from other jurisdictions cited and relied upon by plaintiffs' counsel would appear unnecessary." The court then referred to the inadequacy of the consideration and said: "However, even assuming that the price was inadequate, that fact standing alone would not justify setting aside the trustee's sale. 'In California, it is a settled rule that inadequacy of price, however gross, is not in itself a sufficient ground for setting aside a trustee's sale legally made; there must be in addition proof of some element of fraud, unfairness, or oppression as accounts for and brings about the inadequacy of price.' " Several earlier California cases are cited. The allegation of value was $25,000 and the testimony as to value was conflicting. The sale price was $5,025. (In approving the rule thus stated, we necessarily reject the dictum in Dazet v. Landry, supra, implying that the rule requiring more

than mere inadequacy of price will not be applied "if the inadequacy be so great as to shock the conscience.")

One of the cases relied on in Oller v. Sonoma County Land Title Company, supra, is Odell v. Cox, 151 Cal. 70, 90 P. 194, in which the Supreme Court of California, after citing many cases, said: "The effect of this rule is that where such inadequacy stands alone, unaccompanied by any unfairness or other inequitable incident, it will not authorize the vacating of the sale. But it is universally recognized that inadequacy of price is a circumstance of greater or less weight to be considered in connection with other circumstances impeaching the fairness of the transaction as a cause of vacating it, and that, where the inadequacy is palpable and great, very slight additional evidence of unfairness or irregularity is sufficient to authorize the granting of the relief sought. * * * We think there can be no doubt under the authorities that where, *in addition to gross inadequacy of price*, the purchaser has, in the language of the United States Supreme Court, 'been guilty of any unfairness or has taken any undue advantage,' resulting in such gross inadequacy and consequent injury to the owner of the property, he will be deemed guilty of fraud warranting the interposition of a court of equity in favor of the owner who is himself without fault." (Emphasis supplied.)

The California Supreme Court referred to Graffam v. Burgess, 117 U.S. 180, 6 S.Ct. 686, 29 L.Ed. 839, supporting the rule of gross inadequacy *if, in addition,* the purchaser has been guilty of any unfairness or has taken any undue advantage, or if the owner of the property or the party interested in it has been for any reason misled or surprised.

It also referred to Schroeder v. Young, 161 U.S. 334, 16 S.Ct. 512, 40 L.Ed. 721, an appeal from the judgment of the Supreme Court of the Territory of Utah affirming the decree of the territorial trial court setting aside a judicial sale. Mr. Justice Brown, delivering the unanimous opinion of the United States Supreme Court, said:

"While mere inadequacy of price has rarely been held sufficient in itself to justify setting aside a judicial sale

of property, courts are not slow to seize upon other circumstances impeaching the fairness of the transaction, as a cause for vacating it, especially if the inadequacy be so gross as to shock the conscience. If the sale has been attended by any irregularity, as if several lots have been sold in bulk where they should have been sold separately, or sold in such manner that their full value could not be realized; if bidders have been kept away; if any undue advantage has been taken to the prejudice of the owner of the property, or he has been lulled into a false security; or, if the sale has been collusively, or in any other manner, conducted for the benefit of the purchaser, *and* the property has been sold at a greatly inadequate price,—the sale may be set aside, and the owner may be permitted to redeem." (Emphasis supplied.)

After reciting numerous acts of oppression and fraud, the opinion goes on as follows:

"There are other circumstances also found by the court below, which, *taken in connection with the grossly inadequate price paid,* render it still more inequitable that purchasers standing in the position of the defendants in this case should insist upon the letter of the bargain, and throw something more than a mere doubt upon the fairness of the transaction." (Emphasis supplied.)

Texas observes the same rule. In Klein v. Glass, 53 Tex. 37, the court's final conclusion was: "We do not think, under the testimony as presented by the record, that there was any such fraud, irregularity, or unfairness in the sale as would authorize us to set it aside for inadequacy of price." The sale brought $100. The value of the property sold was $2,000.

It will be recalled from our statement of the facts that the court below rejected all claims of fraud and collusion except the instance of the Goldens' coming into the sale by reason of the information given them by the trustee and their bidding one dollar more than the bid on behalf of the beneficiary. It is quite evident, however, that this created simply a suspicion in the court's mind. During the oral argument counsel for respondents disavowed any claim that there was fraud or conspiracy. He stated that all he claimed was that there was collusion between

the trustee and the Goldens. It would seem to us that for the trustee to bring another bidder to the sale could result only in benefit to the trustors. With the case of the Goldens it resulted in raising the bid only one dollar. The beneficiary under the deed of trust naturally bid only the amount of its debt, particularly in the realization that it was only buying the equity subject to the first mortgage. When the Goldens raised the bid, the beneficiary was not called upon to make a further bid. Nothing in the case warrants a conclusion of collusion to defraud the Tomiyasus. There is no support for the trial court's intimation that there would have been a right of redemption as against the bank but not as against the Goldens.

To sum up, respondents seek to support the judgment by coupling inadequacy of price with one or all of the following: (1) insufficiency of the notice of sale—but this was given strictly in accordance with statute; (2) the several postponements of the sale—but these were all for the benefit of respondents; there were no irregularities, and no prospective bidders were misled. As to the absence of bidders, this court said in McLaughlin v. M. B. & L. Assn., 57 Nev. 181, 60 P.2d 272: "We are not aware of any authority holding that a sale of this kind is void, for the single reason that no persons were present except the trustee and the beneficiary's attorney or agent." (3) the sale of the property as a whole and not by parcels—but there was no abuse here of the exercise of the trustee's discretion, and no one requested a sale by parcels; (4) the release of the five-acre parcel— but the five acres released were to the attorney for the respondents; (5) the acceptance of the check of the high bidder—but this was almost immediately converted into a cashier's check; (6) the attack on the conduct of the trustee in alerting the Goldens to attend the sale and bid, and later in the suggestion that the Goldens' raise in the bid be by one dollar instead of by a few cents— but nothing in this suggests fraud, conspiracy, collusion or other fault. To these observations there should be added the long-existing default; the fact that the trustee

gave information and knowledge to the trustors in addition to that required by statute, and particularly putting them on notice that foreclosure was imminent; the many continuances of the sale to give the trustors an opportunity to refinance; the actual assistance given them by the trustee; the entire absence of anything tending to support the accusation that other bidders were discouraged. To this must be added the consideration of the practical fact that the beneficiary was only bidding in the equity of the trustors. When bidding for the property subject to the provisions of the first deed of trust, the beneficiary was to all intents and purposes assuming the obligation to meet the monthly payments of $705 under the first deed of trust, or, in default of this, in the realization that the first deed of trust could be foreclosed and wipe out the equity purchased by the beneficiary here involved.

In virtually all foreclosures the trustor or mortgagor suffers a loss.[2] He has not been able to meet his obligation and loses the property. When the sale is by a trustee, as in the present case, he loses it without an equity of redemption. If the sale is properly, lawfully and fairly carried out, he cannot unilaterally create a right of redemption in himself. If the sale is made under a mortgage subject to redemption, he cannot unilaterally extend the period of redemption beyond his statutory right. These are all situations which a borrower must recognize in executing a mortgage or deed of trust. We regret, as do all courts facing such a situation, that the mortgagor or trustor must lose his property, but we cannot arbitrarily afford relief under such circumstances as here exist.

Reversed and remanded with instructions to enter judgment denying relief to the respondents.

McNAMEE and THOMPSON, JJ., concur.

---

[2] "1. From time immemorial such 'irreparable injury' has been the lot of mortgagors and trustors who have been unable to meet their obligations." Bankers Trust Co. v. Bordwell, 79 Nev. 473, 386 P.2d 732.