133 Nev., Advance Opinion 91

# IN THE SUPREME COURT OF THE STATE OF NEVADA

NATIONSTAR MORTGAGE, LLC,
Appellant,
vs.
SATICOY BAY LLC SERIES 2227
SHADOW CANYON,
Respondent.

No. 70382

FILED

NOV 22 2017

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court summary judgment in a quiet title action. Eighth Judicial District Court, Clark County; Carolyn Ellsworth, Judge.

*Affirmed.*

Akerman LLP and Ariel E. Stern, Rex D. Garner, and Allison R. Schmidt, Las Vegas,
for Appellant.

Law Offices of Michael F. Bohn, Ltd., and Michael F. Bohn, Las Vegas,
for Respondent.

---

BEFORE HARDESTY, PARRAGUIRRE and STIGLICH, JJ.

*OPINION*

By the Court, HARDESTY, J.:

In *SFR Investments Pool 1, LLC v. U.S. Bank, N.A.*, 130 Nev., Adv. Op. 75, 334 P.3d 408 (2014), this court held that under NRS Chapter 116, a homeowners' association (HOA) has a lien on a homeowner's home for unpaid monthly assessments, that the HOA's lien is split into superpriority and subpriority pieces, and that proper foreclosure of the



superpriority piece of the lien extinguishes a first deed of trust. In so doing, we noted but did not consider whether such a foreclosure sale could be set aside if it were "commercially unreasonable." *Id.* at 418 n.6. Subsequently in *Shadow Wood Homeowners Ass'n, Inc. v. New York Community Bancorp, Inc.*, 132 Nev., Adv. Op. 5, 366 P.3d 1105 (2016), we considered whether such a sale could be set aside based solely on inadequacy of price. Therein, we reiterated the rule from prior Nevada cases that inadequacy of price alone "is not enough to set aside a sale; there must also be a showing of fraud, unfairness, or oppression." *Id.* at 1112 (citing *Long v. Towne*, 98 Nev. 11, 639 P.2d 528 (1982)). Nonetheless, because *Shadow Wood* also cited the Restatement (Third) of Property: Mortgages § 8.3 (1997), which recognizes that a court is "[g]enerally" justified in setting aside a foreclosure sale when the sales price is less than 20 percent of the property's fair market value, 132 Nev., Adv. Op. 5, 366 P.3d at 1112-13 & n.3, appellant Nationstar Mortgage argues that an HOA foreclosure sale can be set aside based on commercial unreasonableness or based solely on low sales price. We therefore take this opportunity to provide further clarification on these issues.

As to the "commercial reasonableness" standard, which derives from Article 9 of the Uniform Commercial Code (U.C.C.), we hold that it has no applicability in the context of an HOA foreclosure involving the sale of real property. As to the Restatement's 20-percent standard, we clarify that *Shadow Wood* did not overturn this court's longstanding rule that "'inadequacy of price, however gross, is not in itself a sufficient ground for setting aside a trustee's sale'" absent additional "'proof of some element of fraud, unfairness, or oppression as accounts for and brings about the inadequacy of price,'" 132 Nev., Adv. Op. 5, 366 P.3d at 1111 (quoting

*Golden v. Tomiyasu*, 79 Nev. 503, 514, 387 P.2d 989, 995 (1963)). That does not mean, however, that sales price is wholly irrelevant. In this respect, we adhere to the observation in *Golden* that where the inadequacy of the price is great, a court may grant relief based on slight evidence of fraud, unfairness, or oppression. 79 Nev. at 514-15, 387 P.2d at 994-95 (discussing *Oller v. Sonoma Cty. Land Title Co.*, 90 P.2d 194 (Cal. Ct. App. 1955)). Because Nationstar's identified irregularities do not establish that fraud, unfairness, or oppression affected the sale, we affirm the district court's summary judgment in favor of respondent Saticoy Bay.

## FACTS AND PROCEDURAL HISTORY

The subject property is located in a neighborhood governed by an HOA. The previous homeowner had obtained a loan to purchase the property, which was secured by a deed of trust, and which was eventually assigned to Nationstar. When the previous homeowner became delinquent on her monthly assessments, the HOA's agent recorded a notice of delinquent assessment lien, a notice of default, and a notice of sale, and then proceeded to sell the property at a foreclosure sale to Saticoy Bay for $35,000. Thereafter, Saticoy Bay instituted the underlying quiet title action, naming Nationstar as a defendant and seeking a declaration that the sale extinguished Nationstar's deed of trust such that Saticoy Bay held unencumbered title to the property.

Saticoy Bay and Nationstar filed competing motions for summary judgment. As relevant to this appeal, Nationstar argued "the sales price of the property at the HOA auction was commercially unreasonable as a matter of law." In support of this argument, Nationstar provided an appraisal valuing the property at $335,000 as of the date of the HOA's foreclosure sale, and it cited to the Restatement (Third) of Property:

Mortgages § 8.3 (1997) for the proposition that a court is generally justified in setting aside a foreclosure sale when the sales price is less than 20 percent of the property's fair market value. In opposition, Saticoy Bay argued that commercial reasonableness is not a relevant inquiry in an HOA foreclosure sale of real property and that, instead, such a sale can only be set aside if it is affected by fraud, unfairness, or oppression. According to Saticoy Bay, because Nationstar had not produced any evidence showing fraud, unfairness, or oppression affected the sale, Saticoy Bay was entitled to summary judgment. Ultimately, the district court agreed with Saticoy Bay and granted summary judgment in its favor. This appeal followed.

## DISCUSSION

We review de novo a district court's decision to grant summary judgment. *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005). "Summary judgment is appropriate . . . when the pleadings and other evidence on file demonstrate that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law." *Id.* (quotation and alteration omitted). "The substantive law controls which factual disputes are material and will preclude summary judgment; other factual disputes are irrelevant." *Id.* at 731, 121 P.3d at 1031.

We first consider whether U.C.C. Article 9's commercial reasonableness standard applies when considering an HOA's foreclosure sale of real property. Concluding that the commercial reasonableness standard is inapplicable, we next consider whether a low sales price, in and of itself, may warrant invalidating an HOA foreclosure sale. After reaffirming our longstanding rule that "inadequacy of price, however gross, is not in itself a sufficient ground for setting aside a [foreclosure] sale,"

*Golden*, 79 Nev. at 514, 387 P.2d at 995, we next consider whether Nationstar produced evidence showing that the sale was affected by "fraud, unfairness, or oppression" that would justify setting aside the sale, *id.* Because we agree with the district court that Nationstar's proffered evidence does not show fraud, unfairness, or oppression affected the sale, we affirm the district court's summary judgment.[1]

*U.C.C. Article 9's commercial reasonableness standard is inapplicable in the context of an HOA foreclosure sale of real property*

Before considering Nationstar's argument regarding commercial reasonableness, some context is necessary. Article 9 of the U.C.C. is entitled "Secured Transactions." Generally speaking, and with various exceptions, Article 9 provides the framework by which a person may obtain money from a creditor in exchange for granting a security interest in personal property (i.e., collateral). *See* NRS 104.9109(1); U.C.C. § 9-109(a) (Am. Law Inst. & Unif. Law Comm'n (2009); *see generally* William H. Lawrence, William H. Henning & R. Wilson Freyermuth, Understanding Secured Transactions §§ 1.01-1.03 (4th ed. 2007) (providing an overview of Article 9's purpose and scope). Article 9 also provides the framework by which the creditor, upon the debtor's default, may repossess and dispose of the personal property to satisfy the outstanding debt. *See* NRS 104.9601-.9628; U.C.C. §§ 9-601 to 9-628. Because a wide array of personal property may be used as collateral, Article 9 does not provide detailed requirements

---

[1]Nationstar also argues that NRS Chapter 116's foreclosure scheme violates its due process rights. That argument fails in light of *Saticoy Bay LLC Series 350 Durango 104 v. Wells Fargo Home Mortgage*, 133 Nev., Adv. Op. 5, 388 P.3d 970 (2017), wherein this court held that due process is not implicated when an HOA forecloses on its superpriority lien in compliance with NRS Chapter 116's statutory scheme because there is no state action.

 

by which a creditor must dispose of the collateral, but instead provides generally that the creditor's disposition of the collateral must be done in a "commercially reasonable" manner. *See* NRS 104.9610(1)-(2); U.C.C. § 9-610(a)-(b); *see also* NRS 104.9627(2) (defining a "commercially reasonable" disposition with reference to the "recognized market" and "in conformity with reasonable commercial practices" for the particular collateral at issue); U.C.C. § 9-627(b) (same); Lawrence, Henning & Freyermuth, *supra* § 18.02 (recognizing that Article 9's procedures governing disposition are "deliberately flexible" because "[t]he drafters hoped that Article 9 dispositions would produce higher prices than those typically obtained in real estate foreclosures").

This court has considered on several occasions whether an Article 9 disposition of collateral was commercially reasonable. In so doing, we have observed that "every aspect of the disposition, including the method, manner, time, place, and terms, must be commercially reasonable," *Levers v. Rio King Land & Inv. Co.*, 93 Nev. 95, 98, 560 P.2d 917, 920 (1977) (quoting the former version of NRS 104.9610(1)), and that "[t]he conditions of a commercially reasonable sale should reflect a calculated effort to promote a sales price that is equitable to both the debtor and the secured creditor," *Dennison v. Allen Grp. Leasing Corp.*, 110 Nev. 181, 186, 871 P.2d 288, 291 (1994). We have also observed that because "a secured creditor is generally in the best position to influence the circumstances of sale, it is reasonable that the creditor has an enhanced responsibility to promote fairness." *Savage Constr., Inc. v. Challenge-Cook Bros., Inc.*, 102 Nev. 34, 37, 714 P.2d 573, 575 (1986). In other words, in the context of Article 9 sales, it is arguable that this court has at least implicitly recognized two things: (1) the secured creditor has an affirmative obligation to obtain the

highest sales price possible; and (2) if the sale is challenged, the secured creditor has the burden of establishing commercial reasonableness. *See Dennison*, 110 Nev. at 186, 871 P.2d at 291; *Savage Constr.*, 102 Nev. at 37, 714 P.2d at 575; *Levers*, 93 Nev. at 98, 560 P.2d at 920; *accord Chittenden Tr. Co. v. Maryanski*, 415 A.2d 206, 209 (Vt. 1980) ("[T]he majority rule appears to be that the secured party has the burden of pleading and proving that any given disposition of collateral was commercially reasonable . . . .").

Relying on our aforementioned case law, Nationstar contends that an HOA foreclosure sale of real property should be subject to Article 9's commercial reasonableness standard, such that the HOA (or the purchaser at the HOA sale) has the burden of establishing that the HOA took all steps possible to obtain the highest sales price it could. We disagree.[2] In contrast to Article 9's "deliberately flexible" requirements regarding the method, manner, time, place, and terms of a sale of personal property collateral, *see* Lawrence, Henning & Freyermuth, *supra* § 18.02, NRS Chapter 116 provides "elaborate" requirements that an HOA must follow in order to foreclose on the real property securing its lien, *see SFR Invs.*, 130 Nev., Adv. Op. 75, 334 P.3d at 416. For example, before an HOA can foreclose, it must mail, record, and post various notices at specific times

---

[2]Our ensuing analysis does not directly address the basis for Nationstar's argument, which relies on a comparison of NRS 116.1113's definition of "good faith" and U.C.C. § 2-103(1)'s definition of "good faith." Nonetheless, we have considered Nationstar's argument. In summary, we find it implausible that the drafters of the Uniform Common Interest Ownership Act (and, in turn, Nevada's Legislature when it enacted NRS Chapter 116) intended to equate U.C.C. Article 9's commercial reasonableness standard pertaining to sales of personal property in a secured transaction with an HOA's sale of real property merely by cross-referencing the definition of "good faith" in U.C.C. Article 2.

and containing specific information. *See generally* NRS 116.31162-.31164 (2013).[3] In other words, because the relevant statutory scheme curtails an HOA's ability to dictate the method, manner, time, place, and terms of its foreclosure sale, an HOA has little autonomy in taking extra-statutory efforts to increase the winning bid at the sale. Thus, HOA foreclosure sales of real property are ill suited for evaluation under Article 9's commercial reasonableness standard.

The Uniform Common Interest Ownership Act (UCIOA), upon which NRS Chapter 116 is modeled, *see SFR Invs.*, 130 Nev., Adv. Op. 75, 334 P.3d at 411, supports our conclusion that HOA real property foreclosure sales are not to be evaluated under Article 9's commercial reasonableness standard. In particular, the UCIOA recognizes that there are technically three different types of common interest communities and that in one of those types, the unit owner's interest in his or her property is characterized as a *personal property* interest. *See* 1982 UCIOA § 3-116(j). Specifically, and although not necessary to examine the distinctions between them for purposes of this appeal, the three different types of common interest communities are: (1) a "condominium or planned community,"[4] (2) "a cooperative whose unit owners' interests in the units are *real estate*," and

---

[3]Because the foreclosure sale in this case took place in January 2014, we refer to the 2013 version of NRS Chapter 116 throughout this opinion. We note, however, that the Legislature's 2015 amendments to NRS Chapter 116 further curtailed an HOA's autonomy regarding the method, manner, time, place, and terms of its foreclosure sale. *See* 2015 Nev. Stat., ch. 266, §§ 2-5, at 1336-42.

[4]The vast majority (perhaps all) of the HOA foreclosure sales that this court has had occasion to review appear to have involved this type of common interest community.

(3) "a cooperative whose unit owners' interests in the units are *personal property.*" *Id.* (emphases added). Tellingly, the UCIOA prompts a state adopting its provisions to choose and insert the following methods of sale for each of the three common interest community types:

> (1) In a condominium or planned community, the association's lien must be foreclosed in like manner as a mortgage on real estate [or by power of sale under [insert appropriate state statute]];

> (2) In a cooperative whose unit owners' interests in the units are real estate . . . , the association's lien must be foreclosed in like manner as a mortgage on real estate [or by power of sale under [insert appropriate state statute]] [or by power of sale under subsection (k)]; or

> (3) ***In a cooperative whose unit owners interests in the units are personal property*** . . . , the association's lien must be foreclosed in like manner as a security interest under [***insert reference to Article 9, Uniform Commercial Code.***]

1982 UCIOA § 3-116(j)(1)-(3) (emphases added).

Thus, the UCIOA's drafters drew a distinction between real property foreclosures under subsections 3-116(j)(1) and (2) and personal property foreclosures under subsection 3-116(j)(3) and expressly indicated that in the context of a personal property foreclosure, Article 9 should apply.[5] Had the drafters intended for Article 9's commercial reasonableness standard to apply to real property foreclosures in addition to personal

---

[5]We recognize that UCIOA § 3-116(j)(2) references "subsection k" and that subsection k contains language similar to Article 9's commercial reasonableness standard. *See* 1982 UCIOA § 3-116(k) ("Every aspect of the sale, including the method, advertising, time, place, and terms must be reasonable."). We do not believe that this language changes the propriety of our reasoning.

property foreclosures, it stands to reason that the drafters would have included such language in subsections (j)(1) and (2). *See* Norman Singer & Shambie Singer, *2A Sutherland Statutory Construction* § 47:23 (7th ed. 2016) ("[W]here a legislature includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed the legislature acts intentionally and purposely in the disparate inclusion or exclusion . . . ." (quotation and alterations omitted)).[6]

Because we conclude that HOA real property foreclosure sales are not evaluated under Article 9's commercial reasonableness standard, Nationstar's argument that the HOA did not take extra-statutory efforts to garner the highest possible sales price has no bearing on our review of the district court's summary judgment. *See Wood*, 121 Nev. at 731, 121 P.3d at 1031 ("The substantive law controls which factual disputes are material and will preclude summary judgment; other factual disputes are irrelevant."). And because HOA real property foreclosures are not subject to Article 9's commercial reasonableness standard, it follows that they are governed by this court's longstanding framework for evaluating any other real property foreclosure sale: whether the sale was affected by some element of fraud, unfairness, or oppression.[7] *Shadow Wood*, 132 Nev., Adv. Op. 5, 366 P.3d

---

[6]To be sure, Nevada's Legislature did not adopt § 3-116(j) when it adopted the UCIOA and instead "handcrafted a series of provisions to govern HOA lien foreclosures." *SFR Invs.*, 130 Nev., Adv. Op. 75, 334 P.3d at 411. Nonetheless, the Legislature's handcrafted provisions draw the same real property/personal property distinction and apply Article 9 only to personal property foreclosures. *See* NRS 116.3116(10).

[7]While we reject the applicability of Article 9's commercial reasonableness standard to HOA real property foreclosures, we contemporaneously clarify that evidence relevant to a commercial reasonableness inquiry may sometimes be relevant to a

at 1111-12 (reaffirming the applicability of this framework after examining case law from this court and other courts); *Long v. Towne*, 98 Nev. 11, 13, 639 P.2d 528, 530 (1982) (applying same framework); *Turner v. Dewco Servs., Inc.*, 87 Nev. 14, 18, 479 P.2d 462, 465 (1971) (same); *Brunzell v. Woodbury*, 85 Nev. 29, 31-32, 449 P.2d 158, 159 (1969) (same); *Golden*, 79 Nev. at 514-15, 387 P.2d at 994-95 (same). Under this framework, and in contrast to an Article 9 sale, *see Chittenden Tr. Co.*, 415 A.2d at 209, Nationstar has the burden to show that the sale should be set aside in light of Saticoy Bay's status as the record title holder, *see Breliant v. Preferred Equities Corp.*, 112 Nev. 663, 669, 918 P.2d 314, 318 (1996) ("[T]here is a presumption in favor of the record titleholder."), and the statutory presumptions that the HOA's foreclosure sale complied with NRS Chapter 116's provisions, NRS 47.250(16) (providing for a rebuttable presumption "[t]hat the law has been obeyed"); *cf.* NRS 116.31166(1)-(2) (providing for a conclusive presumption that certain steps in the foreclosure process have been followed);[8] *Shadow Wood*, 132 Nev., Adv. Op. 5, 366 P.3d at 1111 (observing that NRS 116.31166's language was taken from NRS 107.030(8), which governs power-of-sale foreclosures). However, before considering whether Nationstar introduced evidence that fraud, unfairness, or

---

fraud/unfairness/oppression inquiry. Nothing in this opinion should be construed as suggesting otherwise, nor does this opinion require us to examine the extent to which the two inquiries overlap.

[8]In *Shadow Wood*, we noted the potential due process implications behind NRS 116.31166's conclusive (as opposed to rebuttable) presumption provision. 132 Nev., Adv. Op. 5, 366 P.3d at 1110. This appeal does not implicate the scope of NRS 116.31166's conclusive presumption provision, and we cite the statute only as additional legislative support for the proposition that the party challenging the foreclosure sale bears the burden of showing why the sale should be set aside.

oppression affected the sale, we must first consider Nationstar's argument that it was not required to do so in light of the $35,000 sales price for a property with a fair market value of $335,000.

*A low sales price, in and of itself, does not warrant invalidating an HOA foreclosure sale*

Nationstar's argument is based in part on its interpretation of our opinion in *Shadow Wood*, and as such, a brief summary of *Shadow Wood* is necessary. In *Shadow Wood*, a bank foreclosed on its deed of trust and then obtained the property via credit bid at the foreclosure sale for roughly $46,000. 132 Nev., Adv. Op. 5, 366 P.3d at 1107. Because the bank never paid off the unextinguished 9-month superpriority lien and failed to pay the continually accruing assessments after it obtained title, the HOA foreclosed on its lien. *Id.* at 1112. At that sale, the purchaser bought the property for roughly $11,000. *Id.* The bank filed suit to set aside the sale, and the district court granted the bank's requested relief. *Id.* at 1109.

On appeal, this court considered whether the bank had established equitable grounds to set aside the sale. *Id.* at 1112. This court started with the premise that "demonstrating that an association sold a property at its foreclosure sale for an inadequate price is not enough to set aside that sale; there must also be a showing of fraud, unfairness, or oppression." *Id.* (citing *Long v. Towne*, 98 Nev. 11, 13, 639 P.2d 528, 530 (1982)). We then stated that the bank "failed to establish that the foreclosure sale price was grossly inadequate as a matter of law," *id.*, observing that the $11,000 purchase price was 23 percent of the property's fair market value and therefore the sales price was "not obviously inadequate." *Id.* As support, we cited *Golden v. Tomiyasu*, 79 Nev. 503, 514, 387 P.2d 989, 995 (1963), wherein this court upheld a sale with a purchase price that was 29 percent of fair market value. *Shadow Wood*, 132

Nev., Adv. Op. 5, 366 P.3d at 1112. We also cited the Restatement's suggestion that a sale for less than 20 percent of the property's fair market value may "'[g]enerally'" be invalidated by a court. *Id.* at 1112-13 & n.3 (quoting Restatement (Third) of Prop.: Mortgages § 8.3 (1997)). Our analysis then focused on whether the sale was affected by fraud, unfairness, or oppression. *Id.* at 1113-14.

Nationstar suggests that *Shadow Wood* adopted the Restatement's 20-percent standard by necessary implication and that any foreclosure sale for less than 20 percent of the property's fair market value should be invalidated as a matter of law. Alternatively, if *Shadow Wood* did not adopt the Restatement, Nationstar suggests that this court should do so now.[9] As explained below, we reject both suggestions.

The citation to the Restatement in *Shadow Wood* cannot reasonably be construed as an implicit adoption of a rule that requires invalidating any foreclosure sale with a purchase price less than 20 percent of a property's fair market value. In particular, adopting the Restatement would be inconsistent with this court's holding in *Golden* that "inadequacy of price, however gross, is not in itself a sufficient ground for setting aside a trustee's sale" absent additional "proof of some element of fraud, unfairness, or oppression as accounts for and brings about the inadequacy of price." 79 Nev. at 514, 387 P.2d at 995. If this court had adopted the Restatement, we would have overruled *Golden* rather than cite favorably to it.

---

[9]Although Nationstar's appellate briefs can be construed as making these suggestions, we recognize that during oral argument Nationstar backed away from endorsing such a hard-and-fast rule.

Supreme Court
OF
Nevada

(O) 1947A

13

Nor do we believe that we should adopt a 20-percent standard and abandon *Golden*. Primarily, we note that the Restatement provides no explanation for why 20 percent (as opposed to 10 percent, 30 percent, etc.) should be the price threshold to invalidate a foreclosure sale as a matter of law. Rather, the Restatement arrived at its conclusion that courts are generally warranted in setting aside sales for less than 20 percent of fair market value by simply surveying cases throughout the country that invalidated sales based on price alone and concluding that 20 percent of fair market value was the rough dividing line between where courts upheld the sales and where courts invalidated the sales. *See* Restatement § 8.3 cmt. b. This is not a compelling justification for adopting the Restatement's standard.

Perhaps the best rationale the Restatement gives to support its 20-percent threshold is that if the price is so low as to be "grossly inadequate" or to "shock the conscience," then there *must* have been fraud, unfairness, or oppression affecting the sale. *Id.* cmt. b; *see In re Krohn*, 52 P.3d 774, 781 (Ariz. 2002) (adopting the Restatement and construing it in a similar manner). However, *Golden* considered and rejected this same rationale, concluding there is no reason to invalidate a "'legally made'" sale absent *actual* evidence of fraud, unfairness, or oppression. 79 Nev. at 514, 387 P.2d at 995 (quoting *Oller v. Sonoma Cty. Land Title Co.*, 290 P.2d 880, 882 (Cal. Ct. App. 1955), in adopting California's rule).[10] Because we remain convinced that *Golden*'s reasoning is sound, we decline to adopt the

[10]We note that other jurisdictions agree with the reasoning in *Golden* and *Oller*. *See, e.g., Holt v. Citizens Cent. Bank*, 688 S.W.2d 414, 416 (Tenn. 1984); *Sellers v. Johnson*, 63 S.E.2d 904, 906 (Ga. 1951); *Powell v. St. Louis Cty.*, 559 S.W.2d 189, 196 (Mo. 1977).

Restatement's 20-percent standard or any other hard-and-fast dividing line based solely on price.

This is not to say that price is wholly irrelevant. To the contrary, *Golden* recognized that the price/fair-market-value disparity is a relevant consideration because a wide disparity may require less evidence of fraud, unfairness, or oppression to justify setting aside the sale:

> [I]t is universally recognized that inadequacy of price is a circumstance of greater or less weight to be considered in connection with other circumstances impeaching the fairness of the transaction as a cause of vacating it, and that, where the inadequacy is palpable and great, very slight additional evidence of unfairness or irregularity is sufficient to authorize the granting of the relief sought.

79 Nev. at 515-16, 387 P.2d at 995 (quoting *Odell v. Cox*, 90 P. 194, 196 (Cal. 1907)); *id.* ("'While mere inadequacy of price has rarely been held sufficient in itself to justify setting aside a judicial sale of property, courts are not slow to seize upon other circumstances impeaching the fairness of the transaction as a cause for vacating it, especially if the inadequacy be so gross as to shock the conscience.'" (quoting *Schroeder v. Young*, 161 U.S. 334, 337-38 (1896))). Thus, we continue to endorse *Golden*'s approach to evaluating the validity of foreclosure sales: mere inadequacy of price is not in itself sufficient to set aside the foreclosure sale, but it should be considered together with any alleged irregularities in the sales process to determine whether the sale was affected by fraud, unfairness, or

oppression.[11] *See id.*[12] However, it necessarily follows that if the district court closely scrutinizes the circumstances of the sale and finds no evidence that the sale was affected by fraud, unfairness, or oppression, then the sale cannot be set aside, regardless of the inadequacy of price. *See id.* at 515-16, 387 P.2d at 995 (overruling the lower court's decision to set aside the sale upon concluding there was no evidence of fraud, unfairness, or oppression).

---

[11]While not an exhaustive list, irregularities that may rise to the level of fraud, unfairness, or oppression include an HOA's failure to mail a deed of trust beneficiary the statutorily required notices, *see SFR Invs. Pool 1, LLC v. U.S. Bank, N.A.*, 130 Nev., Adv. Op. 75, 334 P.3d 408, 418 (2014) (observing that NRS 116.31168 incorporates NRS 107.090, which requires that notices be sent to a deed of trust beneficiary); *id.* at 422 (Gibbons, C.J., dissenting) (same); *Bourne Valley Court Trust v. Wells Fargo Bank, NA*, 832 F.3d 1154, 1163-64 (9th Cir. 2016) (Wallace, J., dissenting) (same), *cert. denied*, ___ U.S. ___, ___ S. Ct. ___, 2017 WL 1300223; an HOA's representation that the foreclosure sale will not extinguish the first deed of trust, *see ZYZZX2 v. Dizon*, No. 2:13-cv-1307, 2016 WL 1181666, at *5 (D. Nev. Mar. 25, 2016); collusion between the winning bidder and the entity selling the property, *see Las Vegas Dev. Grp., LLC v. Yfantis*, 173 F. Supp. 3d 1046, 1058 (D. Nev. 2016); *Polish Nat'l Alliance v. White Eagle Hall Co.*, 470 N.Y.S.2d 642, 650-51 (N.Y. App. Div. 1983); a foreclosure trustee's refusal to accept a higher bid, *see Bank of Seoul & Trust Co. v. Marcione*, 244 Cal. Rptr. 1, 3-5 (Ct. App. 1988); or a foreclosure trustee's misrepresentation of the sale date, *see Kouros v. Sewell*, 169 S.E.2d 816, 818 (Ga. 1969).

[12]This court has endorsed a similar approach in evaluating Article 9 sales. *See Iama Corp. v. Wham*, 99 Nev. 730, 736, 669 P.2d 1076, 1079 (1983); *Levers v. Rio King Land & Inv. Co.*, 93 Nev. 95, 98-99, 560 P.2d 917, 920 (1977); *see also* U.C.C. § 9-627 cmt. 2 (indicating that when an Article 9 sale yields a low price, courts should "scrutinize carefully" all aspects of the collateral's disposition). If Nationstar's reliance on Article 9 is meant solely to argue in favor of applying such an approach in the context of real property foreclosures, we have no issue with that argument, as it does not change existing law.

In sum, we decline to adopt the Restatement's suggestion that a foreclosure sale for less than 20 percent of fair market value necessarily invalidates the sale, meaning Nationstar was not entitled to have the foreclosure sale invalidated based solely on Saticoy Bay purchasing the property for roughly 11 percent of the property's fair market value ($35,000 purchase price for a property valued at $335,000). Consequently, we must next consider whether Nationstar's identified irregularities in the sales process show that the sale was affected by fraud, unfairness, or oppression.

*Nationstar's identified irregularities do not show that the HOA foreclosure sale was affected by fraud, unfairness, or oppression*

Nationstar points to three purported irregularities in the foreclosure process as evidence that the sale was affected by fraud, unfairness, or oppression: (1) the HOA's lien included fines in addition to monthly assessments even though NRS 116.31162(5) prohibits an HOA from foreclosing on a lien comprised of fines; (2) the notice of sale listed the unpaid lien amount as of the day the notice of sale was generated even though NRS 116.311635(3)(a) requires the notice of sale to list what the unpaid lien amount will be on the date of the to-be-held sale; and (3) the person who signed the notice of default was not the person who the HOA's president designated to sign the notice, which violated NRS 116.31162(2).[13] We consider each identified irregularity in turn.

---

[13]Nationstar also argues that the foreclosure sale was conducted in violation of the statute of limitations. Although the argument is not properly raised on appeal because Nationstar did not raise it in district court, *see Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981), the argument nevertheless fails in light of *Saticoy Bay LLC Series 2021 Gray Eagle Way v. JPMorgan Chase Bank, N.A.*, which determined that "a party has instituted 'proceedings to enforce the lien'" when the

*Foreclosure of a lien that includes fines does not invalidate the sale*

Nationstar's first argument relies on NRS 116.31162(5), which provides that an HOA "may not foreclose a lien by sale based on a fine or penalty." Here, because it is undisputed that the HOA's lien was comprised of fines in addition to monthly assessments, Nationstar argues that the sale violated NRS 116.31162(5) and therefore is void.[14] We believe Nationstar's interpretation of the statute is untenable. In particular, NRS 116.3116(1) is the statute that authorizes an HOA's lien, and that statute provides that an HOA has a lien for fines *and* monthly assessments and that those fines and assessments automatically become part of the HOA's lien as soon as they become due. Thus, under Nationstar's construction of NRS 116.31162(5), an HOA could never foreclose on its lien if it had imposed a fine on the homeowner, regardless of whether the HOA's lien was also comprised of unpaid monthly assessments.

It does not appear that the Legislature intended this result, as NRS 116.31162(5) was enacted in 1997, six years after the Legislature enacted the UCIOA (i.e., NRS Chapter 116), which included NRS 116.3116(1). *See* 1997 Nev. Stat., ch. 631, § 17, at 3122; 1991 Nev. Stat., ch. 245, §§ 1-142, at 535-87. Based on the legislative history, the Legislature enacted NRS 116.31162(5) in conjunction with several other statutes in an apparent attempt to curb an HOA's ability to arbitrarily fine a homeowner and then foreclose on the homeowner's home. *See* Hearing on S.B. 314

---

homeowner is provided a notice of delinquent assessment. 133 Nev., Adv. Op. 3, 388 P.3d 226, 231 (2017) (quoting NRS 116.3116(6)).

[14]In this respect, it is unclear whether Nationstar is relying on the foreclosed-upon fines as evidence of fraud, unfairness, or oppression or as an independent statutory basis for setting aside the sale. Regardless, we are not persuaded by the argument for the reasons given below.

Before the Senate Comm. on Commerce & Labor, 69th Leg. (Nev., May 1, 1997) (statement of Gail Burks, President of the Nevada Fair Housing Center, memorialized in exhibit L, explaining that HOAs tend to "abuse their authority" by "foreclos[ing] on a property for unpaid fines"); Hearing on S.B. 314 Before the Senate Comm. on Commerce & Labor, 69th Leg. (Nev., June 24, 1997) (discussing the purpose of what would become NRS 116.31162(5) without reference to its effect on NRS 116.3116(1)); 1997 Nev. Stat., ch. 631, §§ 1-27, at 3110-27 (enacting what would become NRS 116.31162(5) without altering NRS 116.3116(1)).

Because the Legislature did not discuss what impact NRS 116.31162(5) would have on NRS 116.3116(1), it is improbable that the Legislature intended for NRS 116.31162(5) to have the effect that Nationstar proposes. Rather, because the Legislature did not consider NRS 116.3116(1) when it enacted NRS 116.31162(5), it appears that the Legislature intended for NRS 116.31162(5) to prohibit an HOA from foreclosing on a lien that was comprised *solely* of fines. *See Barney v. Mount Rose Heating & Air Conditioning*, 124 Nev. 821, 826, 192 P.3d 730, 734 (2008) ("Statutes are to be read in the context of the act and the subject matter as a whole . . . ."); *Banegas v. State Indus. Ins. Sys.*, 117 Nev. 222, 228, 19 P.3d 245, 249 (2001) ("The intent of the Legislature may be discerned by reviewing the statute or the chapter as a whole."). Thus, the fact that the HOA in this case foreclosed on a lien that was comprised of fines in addition to monthly assessments does not violate NRS 116.31162(5) so as to invalidate the sale.

Even if the sale is not void, Nationstar suggests that unfairness exists because all the foreclosure sale proceeds were distributed to the HOA (including fine-related proceeds) instead of just the HOA's superpriority lien

Supreme Court
OF
Nevada

(O) 1947A

19

amount.[15] However, Saticoy Bay points out that this post-sale impropriety would not warrant invalidating the sale because NRS 116.31166(2) absolves Saticoy Bay from any responsibility to see that the sale proceeds are properly distributed and that Nationstar's recourse, if any, is against the HOA or its agent that conducted the sale and distributed the proceeds. Indeed, NRS 116.31166(2) appears to support Saticoy Bay's argument, as the statute provides that "[t]he receipt for the purchase money contained in such a deed is sufficient to discharge the purchaser from obligation to see to the proper application of the purchase money." Because Nationstar has not addressed Saticoy Bay's reliance on NRS 116.31166(2), we need not definitively determine whether the statute has such an effect in all cases implicating a dispute regarding post-sale distribution of proceeds. *See Ozawa v. Vision Airlines, Inc.,* 125 Nev. 556, 563, 216 P.3d 788, 793 (2009) (treating a party's failure to respond to an argument as a concession that the argument is meritorious). For purposes of this case, however, we are not persuaded that the apparently improper post-sale distribution of proceeds amounts to unfairness so as to justify invalidating an otherwise properly conducted sale.

> *The notice of sale's failure to list the unpaid lien amount on the date of the sale does not amount to fraud, unfairness, or oppression*

Nationstar's next argument is based on NRS 116.311635(3)(a), which provides that the notice of sale "must include [t]he amount necessary to satisfy the lien as of the date of the proposed sale." Here, the notice of sale listed the unpaid lien amount as of the date the notice was generated,

---

[15]As we explained in *Horizons at Seven Hills v. Ikon Holdings*, 132 Nev., Adv. Op. 35, 373 P.3d 66, 73 (2016), the superpriority portion of the lien included only the amount equal to nine months of common expense assessments, not any fines, collection fees, and foreclosure costs.

not as of the date of the to-be-held sale. Accordingly, Nationstar contends that this irregularity amounts to fraud, unfairness, or oppression sufficient to warrant setting aside the sale when considered in conjunction with the sale price being roughly 11 percent of the property's value. Although the notice of sale technically violated the statute, we are not persuaded that this irregularity amounts to fraud, unfairness, or oppression. Significantly, there is no evidence in the record to suggest that Nationstar ever tried to tender payment in any amount to the HOA, much less that Nationstar was confused or otherwise prejudiced by the notice of sale. Thus, we conclude that this technical irregularity does not amount to fraud, unfairness, or oppression.

*The person who signed the notice of default was authorized by the HOA to do so*

Nationstar's last argument is based on NRS 116.31162(2), which provides that the notice of default "must be signed by the person designated in the declaration or by the association for that purpose or, if no one is designated, by the president of the association." Here, Nationstar appears to be arguing that the HOA violated NRS 116.31162(2) because the notice of default was signed by Yvette Thomas (an employee of the HOA's agent, Red Rock Financial Services) and there is no evidence in the record showing that the HOA's declaration (i.e., its CC&Rs) or the HOA's president specifically designated Ms. Thomas as the person who could sign the notice of default. To the extent that this is Nationstar's argument, we disagree. Although the statute provides that the notice of default "must" be signed by the person designated to sign the notice, the statute provides three ways by which that person may be designated, one of which is "by the association." Thus, "the association" may make a collective decision whom to designate even if its CC&Rs or president made no such designation. Nor did the HOA

SUPREME COURT
OF
NEVADA

(O) 1947A

21

violate the statute by designating Red Rock Financial Services in general and not Ms. Thomas specifically, as NRS 116.073's definition of "person" supplements NRS 0.039's general definition of "person," which expressly includes "any . . . association." Accordingly, because the HOA did not violate NRS 116.31162(2), this alleged irregularity in the sales process necessarily does not amount to fraud, unfairness, or oppression.

In sum, because a low sales price alone does not warrant invalidating the foreclosure sale, and because Nationstar failed to introduce evidence that the sale was affected by fraud, unfairness, or oppression, the district court correctly determined that Saticoy Bay was entitled to summary judgment on its quiet title and declaratory relief claims. *Wood*, 121 Nev. at 729, 121 P.3d at 1029. We therefore affirm.

_____, J.
Hardesty

We concur:

_____, J.
Parraguirre

_____, J.
Stiglich

SUPREME COURT
OF
NEVADA

(O) 1947A